T. Jack Foster, et al. [1] v. Commissioner.
Foster v. Commissioner
Docket Nos. 1004-64, 1005-64, 1025-64 - 1042-64, 1088-64.
United States Tax Court
T.C. Memo 1966-273; 1966 Tax Ct. Memo LEXIS 10; 25 T.C.M. (CCH) 1390; T.C.M. (RIA) 66273; December 27, 1966
Roy C. Lytle, 824 Commerce Exchange Bldg., Oklahoma City, Okla., for the petitioners, J. C. Linge, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in the income tax liability of Likins-Foster Honolulu Corporation and subsidiaries for the fiscal years ended June 30, 1957, June 30, 1958, and June 30, 1959, in the respective amounts of $109,603.60, $744,425.31, and $643,982.47, *14 and by amendment to answer claimed an increased deficiency for the fiscal year ended June 30, 1957, making a total deficiency claimed for that year of $161,082.09. [2]
Respondent determined deficiencies in income tax and addition to the tax under section 6651(a) of the Internal Revenue Code of 1954[3] for the taxable period February 11, 1958, through June 30, 1958, and a deficiency in income tax for the fiscal year *15 ended June 30, 1959, of Likins-Foster Ord Corp., transferor, in the respective amounts of $155,326.33, $38,831.58, and $97,756.63, and further determined that Likins-Foster Honolulu Corporation, T. Jack Foster, T. Jack Foster, Jr., John R. Foster, and Richard H. Foster were each liable as a transferee of Likins-Foster Ord Corporation in the amount of $291,914.54. By amendments to answers, respondent claimed an increased deficiency in income tax for the fiscal year ended June 30, 1959, of Likins-Foster Ord Corp., transferor, in the amount of $18,049.87, bringing the total deficiency in income tax of the transferor claimed for this year to $115,806.50 and alleged that Likins-Foster Honolulu Corp., T. Jack Foster, T. Jack Foster, Jr., John R. Foster, and Richard H. Foster were each liable as a transferee of Likins-Foster Ord Corp. in the respective amounts of $309,964.41, $90,058.22, $10,006.47, $10,006.47, and $10,006.47. Respondent determined deficiencies in income tax and addition to the tax under section 6651(a) for the taxable period February 11, 1958, through June 30, 1958, and a deficiency *16 in income tax for the fiscal year ended June 30, 1959, of Likins-Foster Monterey Corp., transferor, in the respective amounts of $138,052.06, $34,513.02, and $97,756.63, and further determined that Likins-Foster Honolulu Corporation, T. Jack Foster, T. Jack Foster, Jr., John R. Foster, and Richard H. Foster were each liable as a transferee of Likins-Foster Monterey Corporation in the amount of $270,321.71. By amendments to answers respondent alleged that the deficiency in income tax for the fiscal year ended June 30, 1959, of Likins-Foster Monterey Corp., transferor, should be decreased by the amount of $18,049.88, leaving a total deficiency in income tax of the transferor claimed for this year of $79,706.75 and alleged that Likins-Foster Honolulu Corp., T. Jack Foster, T. Jack Foster, Jr., John R. Foster and Richard H. Foster were each liable as a transferee of Likins-Foster Monterey Corp. in the respective amounts of $252,271.83, $91,707.59, $10,189.75, $10,189.75 and $10,189.75. Respondent determined a deficiency in income tax for the fiscal year ended June 30, 1959, of Likins-Foster Biggs Corp., transferor, in the amount of $42,250 and further determined that Likins-Foster Honolulu *17 Corporation, T. Jack Foster, T. Jack Foster, Jr., John R. Foster and Richard H. Foster were each liable as a transferee of Likins-Foster Biggs Corp. in the amount of $42,250. By amendments to answer respondent claimed an increased deficiency in income tax for the fiscal year ended June 30, 1959 of Likins-Foster Biggs Corp., transferor, in the amount of $625 bringing the total deficiency in income tax of the transferor claimed for this year to $42,875 and alleged that Likins-Foster Honolulu Corp., T. Jack Foster, T. Jack Foster, Jr., John R. Foster and Richard H. Foster were each liable as a transferee of Likins-Foster Biggs Corp., in the respective amounts of $42,875, $42,875, $15,057.58, $15,057.59 and $15,057.58. Respondent determined a deficiency in income tax for the fiscal year ended June 30, 1959, of Likins-Foster El Paso Corp., transferor, in the amount of $42,250 and further determined that Likins-Foster Honolulu Corporation, T. Jack Foster, T. Jack Foster, Jr., John R. Foster and Richard H. Foster were each liable as a transferee of Likins-Foster El Paso Corp., in the amount of $42,250. By amendments to answers respondent claimed a decreased deficiency in income tax for *18 the fiscal year ended June 30, 1959, of Likins-Foster El Paso Corp., transferor, in the amount of $625 bringing the total deficiency in income tax of the transferor claimed for this year to $41,625 and alleged that Likins-Foster Honolulu Corp., T. Jack Foster, T. Jack Foster, Jr., John R. Foster, and Richard H. Foster were each liable as a transferee of Likins-Foster El Paso Corp. in the respective amounts of $41,625, $41,625, $14,529.38, $14,529.38, and $14,529.38. Some of the issues raised by the pleadings have been disposed of by the parties, each party having made certain concessions at the trial or on brief. The issues left for our decision are the following: (1) Whether the net operating loss deduction claimed by Likins-Foster Honolulu Corp. and subsidiaries on their consolidated corporate tax return for the fiscal year ended June 30, 1957, should be reduced by $639,488.61 or any portion thereof. The reduction of $639,488.61 in the claimed net operating loss is composed of several items so that resolution of this issue is dependent upon the decision reached as to the following questions: (a) Whether the gains upon the sale of 421 houses to persons unrelated to any of the *19 corporations in the Likins-Foster Honolulu Corp. consolidated group were properly reallocated by respondent under the provisions of section 482 from the affiliates reporting the gains to another affiliate which had originally owned the houses but had purportedly made a transfer of the houses to the affiliates reporting the gains. If respondent properly reallocated the gains realized on the sale of these houses, then the separate income for the fiscal year ended June 30, 1957, of each of the affiliates which reported these gains would be reduced by the amounts of such gains reported and certain loss carryovers incurred by the affiliates prior to the time they became members of the consolidated group would not be usable, thereby reducing the total net operating loss available to the consolidated group for the fiscal year ended June 30, 1957, by $388,891.28. If the gains were not properly reallocated, did they constitute ordinary income to the affiliates reporting them? (b) What is the proper method to be used in the application of net operating loss carryovers of affiliates from years for which those affiliates filed separate returns to years in which the affiliates were members of *20 the group filing a consolidated return? [4]
(c) Whether the income of Likins-Foster Honolulu Corp. for the taxable year ended June 30, 1956, should be increased by the amount of $153,671 distributed to it in cash from two of its subsidiaries so that the loss carryover to the fiscal year ended June 30, 1957, should properly be decreased by this amount. The correctness of the increase in the income of Likins-Foster Honolulu Corp. requires a determination of whether cash distributions to it by two of its subsidiaries were dividends or were distributions which reduced the parent's basis in the stock of its subsidiaries with the excess received over its basis in the stock constituting taxable income to the parent. (2) Whether Likins-Foster Honolulu Corp. realized gains during its fiscal year ended *21 June 30, 1957, from payments made to it by two of its subsidiaries for redemption of stock of those two subsidiaries. One of the two subsidiaries was one that had made distributions to the parent corporation in 1956 which respondent had determined to result in taxable income to the parent in that year and therefore the determination of whether the distributions in 1956 reduced the parent's basis in the subsidiaries' stock affects the amount above basis which the parent received upon redemption. The other subsidiary had made a distribution to the parent in 1956 which respondent determined reduced the basis of the parent in its stock although respondent made no determination that income resulted in the fiscal year 1956 from this distribution since the reduction in basis of the stock was less than the parent's basis in the stock. The amount of the parent's basis in the stock redeemed is also affected by whether an adjustment is required for losses of these subsidiaries availed of in consolidated returns which could not have been used if a separate return had been filed by that subsidiary. (3) Whether Likins-Foster Honolulu Corp. and subsidiaries are entitled to deductions in computing *22 the consolidated corporate income for; (a) The amount of $2,700 paid by two of the subsidiaries for legal services in connection with the redemption by these subsidiaries of certain of their stock during the fiscal year ended June 30, 1957. (b) The amount of $17,500 paid by the partnership T. Jack Foster and Sons, during the fiscal year ended June 30, 1958, to a law firm for services rendered on behalf of all the Foster Companies in 1956 and charged by the partnership of T. Jack Foster and Sons, to Likins-Foster Honolulu Corp. and subsidiaries. (c) The amount of $500 of $1,944 paid by T. Jack Foster and Sons, a partnership, to a New York City attorney for an opinion with respect to how four of the subsidiaries of Likins-Foster Honolulu Corp. should proceed in condemnation negotiations with the United States, and allocated by the partnership to the four corporations whose properties were threatened with condemnation and a $5,000 legal fee and $9,000 of appraisal fees paid by the corporations whose properties were condemned in connection with the condemnation proceedings. (4) Whether certain items paid by one of the subsidiaries of Likins-Foster Honolulu Corp. in connection with *23 the acquisition from an unrelated party of certain properties were deductible in the fiscal year ended June 30, 1957, during which they were paid, or constituted a portion of the capital invested in the project and should therefore be used to increase the cost of the properties and the basis of the properties when they were subsequently sold. (5) Whether certain portions of deductions claimed by Likins-Foster Honolulu Corp. and its subsidiaries as travel and entertainment expenses during the fiscal years ended June 30, 1958 and June 30, 1959, were properly disallowed by respondent. (6)(a) Whether the consolidated income of Likins-Foster Honolulu Corp. and its subsidiaries for the fiscal year ended June 30, 1958, should be increased because of gains being realized by four of these subsidiaries upon condemnation in the latter part of 1957 of their properties by the United States Government, their bases in these properties at the date of the declaration of taking by the United States being less than the principal due on the mortgages outstanding thereon. In the alternative, if gain was not realized at the date of taking, whether these subsidiaries realized income because of the execution *24 of agreements by the United States Department of Defense, the mortgagees and the Federal Housing Administration which made provisions with respect to payment of the mortgages on the properties of the subsidiaries which had been condemned by the United States. The four subsidiaries ceased to be affiliates of Likins-Foster Honolulu Corp. as of February 10, 1958. (b) Whether the four subsidiary corporations whose properties were condemned by the United States realized a taxable gain during their fiscal years ended June 30, 1959, when they withdrew amounts which had been deposited by the United States with the District Courts at the time of the filing of the declaration of taking and at the time of the filing of an amended declaration of taking. (c) If the four subsidiaries did realize a gain upon the withdrawal of the deposits from the escrow account, was this gain with respect to property sold within a year after the adoption of a plan of complete liquidation and therefore not subject to tax under the provisions of section 337? (7) Whether respondent properly disallowed deductions for finance fees, interest, administrative and other corporate expense claimed by Likins-Foster Honolulu *25 Corp. and subsidiaries for the fiscal year ended June 30, 1959, in the amount of $325,000 because of petitioners' failure to show that the expenditures constituted ordinary and necessary business expenses. (8) Whether Likins-Foster Honolulu Corp. had a gain during its fiscal year ended June 30, 1959, because of the transfer to it of the amount withdrawn from the deposits made by the United States in connection with the declaration of taking of property on condemnation of four of its subsidiary corporations because of the amounts withdrawn being turned over to it by the subsidiary corporation by which it was withdrawn as a distribution in liquidation. (9) The transferees admit that they are liable as transferees and do not appear to contest the amount of that liability as ultimately alleged by respondent in his amendments to answers, but since this is not unmistakably clear we will include a finding as to the extent of the value of the assets transferred to each transferee as shown by the evidence. Findings of Fact Some of the facts have been stipulated and are found accordingly. Likins-Foster Honolulu Corp. (hereinafter referred to as Honolulu) and all the other corporations *26 involved in these cases, except Cochiti Pumice Company, which is incorporated under the laws of New Mexico, and Central Development Co., Ltd., which is incorporated under the laws of Hawaii, are corporations organized and existing under the laws of Delaware. During all the years here involved all of these corporations maintained their books and records in the State of Oklahoma and filed their Federal income tax returns with the district director of internal revenue at Oklahoma City. T. Jack Foster (hereinafter referred to as Foster) and Gladys Foster are husband and wife. T. Jack Foster, Jr., John R. Foster, and Richard H. Foster are sons of T. Jack Foster and Gladys Foster. Foster's sons will hereinafter be referred to by their first names. Foster and each of his sons kept their books and records and filed their Federal income tax returns during all the years here material with the district director of internal revenue at Oklahoma City. There is no issue involved in this case with respect to the individual tax liability of Foster or any one of his sons. They are involved in this case because of respondent's determination that they are liable as transferees of Likins-Foster Ord *27 Corp. (hereinafter referred to as Ord), Likins-Foster Monterey Corp. (hereinafter referred to as Monterey), Likins-Foster Biggs Corp. (hereinafter referred to as Biggs), and Likins-Foster El Paso Corp. (hereinafter referred to as El Paso). For the fiscal years ended June 30, 1954, 1955, 1956, 1957, 1958 and 1959 Honolulu and subsidiaries filed consolidated Federal income tax returns. Ord, Monterey, Biggs and El Paso became ineligible to file consolidated returns with Honolulu as of February 10, 1958, because Honolulu ceased as of that date to own 80 percent or more of the stock of those corporations. On or about October 5, 1959, each of those corporations filed a separate corporate Federal income tax return for the taxable period February 11, 1958 to June 30, 1958, and for the fiscal year ended June 30, 1959 with the district director of internal revenue at Oklahoma City. The subsidiary corporations that filed consolidated Federal income tax returns with Honolulu and the years for which the income of each was included in the consolidated returns are as follows: Taxable years for which such cor-
poration filed a consolidated
Name of corporation
return with Honolulu
Aliamanu Homes, Ltd.
6-30-54 through 6-30-59
Likins-Foster Ord Corp.
6-30-54 through 2-10-58
Likins-Foster Monterey Corp.
6-30-54 through 2-10-58
Likins-Foster Biggs Corp.
6-30-54 through 2-10-58
Likins-Foster El Paso Corp.
6-30-54 through 2-10-58
Likins-Foster Olathe Corp.
6-30-55 through 6-30-59
Likins-Foster Topeka Corp.
6-30-54 through 6-30-59
Likins-Foster Salina Corp.
6-30-54 through 6-30-59
Cochiti Pumice Company
6-30-55 through 6-30-59
Lomita Homes, Inc.
6-30-54 through 6-30-59
Cardiff Homes, Inc.
6-30-54 through 6-30-59
Highland Park Homes, Inc.
6-30-54 through 6-30-59
Biggs Rental Co.
6-30-57 through 6-30-59
Foster Homes, Ltd.
6-30-57 through 6-30-59
Foster Development Corp.
6-30-57 through 6-30-59
Central Development Co., Ltd.
6-30-58 through 6-30-59
*28 From and after February 10, 1958, all of the capital stock outstanding and issued by Ord, Monterey, Biggs, and El Paso was owned as follows: Percent
Number of
of stock
Shareholder
shares
owned
Likins-Foster Honolulu
Corp.
119
79 1/3
T. Jack Foster
23 1/4
15 1/2
T. Jack Foster, Jr.
2 7/12
1 13/18
John R. Foster
2 7/12
1 13/18
Richard H. Foster
2 7/12
1 13/18
Foster is the president or chairman of the board of Honolulu and of each of its subsidiaries or affiliates. The corporations were organized in the period from 1950 to 1953 and all but one have been continuously engaged in the business of developing land, building dwellings, and renting or selling them. The one exception was Cochiti Pumice Co. which for a time was engaged in the development of pumice deposits in New Mexico. Foster was initially connected in his various business enterprises with an individual named Likins. About 1955 Likins retired and his interests in the various enterprises were purchased by Honolulu and Foster's sons. Likins and Foster had operated a partnership which performed services for their corporations. After Likins' retirement, Foster and his sons formed *29 a similar partnership under the name "T. Jack Foster & Sons." All of the building and development was done by the corporations. Some of the developments carried out by the corporations were known variously as Wherry projects, 903 projects, 203 projects, and 213 projects. The numerals refer to sections of the Federal housing acts under which Federal financing for the projects was obtained. "Wherry project" refers to a project built in accordance with provisions of the Federal Military Housing Act (hereinafter sometimes referred to as the Wherry Act). Under this act a developer obtained a long-term lease of land from the Department of Defense for nominal rent for the purpose of constructing dwellings for rental to military personnel. The FHA guaranteed the loans obtained to construct the houses in Wherry projects, as well as those obtained in connection with nonmilitary projects. Each project was owned by a separate corporation primarily because of FHA or Wherry Act restrictions on the size of a mortgage which would be guaranteed for one corporation or the number of dwellings which one mortgage could cover. It was because of these restrictions that Ord and Monterey each built and leased *30 a portion of the houses in a large project at Fort Ord, California, and El Paso and Biggs each built and leased a portion of the houses in the project at Biggs Air Force Base, Texas. Reallocation of Gains on Sales of Houses Issue 1(a) Likins-Foster Topeka Corp. (hereinafter referred to as Topeka) constructed and owned 421 houses and duplexes (486 units) in Topeka, Kansas, which were rented by it to personnel of Forbes Air Force Base from the time of completion until about July 1, 1956, at which date all of those properties were transferred to Ord, Monterey, Biggs, and El Paso (referred to collectively as the Wherry corporations) each grantee receiving by deeds certain definite lots. It had been decided that Topeka should dispose of this property because the area was about to be taken within the city limits of Topeka, Kansas, which would cause an increase in taxes, and also because a new, large housing project was going to be built for the use of Forbes Air Force Base personnel. It was decided that Topeka would transfer this property to four of its affiliated corporations before ultimate sale to outside parties. Topeka was liable on the mortgages on these properties to *31 the FHA by which the project had been initially financed. The FHA had previously assigned the mortgages on these properties to the Federal National Mortgage Association (hereinafter referred to as FNMA). Topeka transferred the houses subject to the mortgages to the Wherry corporations, but the transferees did not assume the mortgages. The books and records of Topeka show a sale price of the 421 houses and duplexes in an amount which exceeded its cost basis by $882,967.39. After the transfer Topeka owned no rental properties. The consolidated blance sheet for the year ended June 30, 1957, shows that Topeka had an asset entitled, "accounts receivable - intercompany-$736,816," and total assets of $774,097. This balance sheet shows no mortgage liability of Topeka and shows a "separate earned deficit - $88,290" and a "consolidated earned surplus - $628,639." After the transfer by Topeka of the 421 houses to the Wherry corporations there was no significant change in the operations carried on in Topeka, Kansas, with respect to the properties transferred. There had been a small office staff of two or three people located in Topeka who handled the rentals and looked after upkeep of these properties. *32 After the transfer of the houses to the Wherry corporations, one or two persons, including one of Foster's sons, were added to the office force in Topeka to handle the individual sales of the houses. During the fiscal year ended June 30, 1957, Ord, Monterey, Biggs, and El Paso sold, by contracts of sale, all of the houses and lots. A typical contract of sale entered into between a Wherry corporation and the purchaser of one of the houses provided that the property was sold subject to the FHA mortgage, that payments of the purchase price would consist of (1) monthly payments with respect to the FHA mortgage of principal and interest, insurance, taxes and mortgage insurance, and (2) initial payment and monthly payment of principal and interest to the seller on the amount of the sales price in excess of the amount remaining due on the FHA mortgage. The seller agreed to convey title to the purchaser upon payment in full of the amount due to the seller. The sales were completed in June 1957. The books and records of the several corporations disclose that on June 29, 1957, Ord, Monterey, Biggs, and El Paso transferred and assigned the balances due on the contracts of sale acquired *33 by them in connection with the sale of the 421 housing units to Honolulu as dividends, and in the case of Biggs, partially by the assumption by Honolulu of certain liabilities of Biggs to other members of the consolidated group. The transaction was treated by Topeka on its books and records as an intercompany transaction and no part of the gain at which it transferred the properties was reported as taxable income on the consolidated return filed for the year ended June 30, 1957. Topeka reported a loss of $63,439 for consolidated purposes that year which was determined as follows: Topeka reported a gross income of $928,844, which included $1,221,743 from "sale of houses and lots" plus amounts of income from other sources, less $299,945, "cost of houses and lots sold." Topeka reported expense deductions of $109,316, leaving a net income of $819,528. An amount of $882,967 was eliminated as "intercompany sales," leaving a loss of $63,439. The books and records of the Wherry corporations disclose that the properties transferred to them from Topeka sold for an amount of $387,654 in excess of the amount paid therefor to Topeka. The Wherry corporations reported the sales as installment *34 sales on the consolidated return for the year ended June 30, 1957, as follows: Taxable
gain for
fiscal
Units sold
Profit
year
Ord
106 houses
40 duplexes
$ 440,196
$ 95,314
Monterey
91 houses
300,003
142,455
Biggs
94 houses
274,965
110,098
El Paso
80 houses
255,458
124,974
411 buildings *
$1,270,622
$472,841
The amount, $472,841, shown above, represents down payments received at the time of sale, plus collections made on the contracts of sale during the fiscal year ended June 30, 1957. The Wherry corporations reported gross and net taxable income for the fiscal year ended June 30, 1957, as follows: Gross in-
Deduc-
Net in-
come
tions
come
Ord
$668,193
$582,441
$ 85,753
Monterey
639,271
553,178
86,093
Biggs
521,748
415,404
106,344
El Paso
527,934
413,354
114,580
As of June 30, 1956, the Wherry corporations each had net operating loss carryovers from years for which each had filed a separate return. The following *35 schedule shows the part of such carryovers which is attributable to the taxable year ended December 31, 1952, the total carryover available to each of the Wherry corporations for the fiscal year ended June 30, 1957, and the excess (deficiency) of such total carryover over (below) the net income reported by each of the corporations for the fiscal year ended June 30, 1957. Total separate
Excess (deficiency) over
Loss attribu-
net operat-
income shown for fis-
table to
ing loss
cal year ended
1952
carryover
June 30, 1957
Ord
$30,889
$ 81,875
($ 3,878)
Monterey
10,711
123,139
37,046
Biggs
49,681
106,418
74
El Paso
58,187
114,945
365 Topeka had no net operating loss carryover from its separate return years at June 30, 1956. The consolidated group reported aggregated taxable income of $218,862 for the year ended June 30, 1957, and claimed a net operating loss deduction of $870,461, which was applied as hereinafter set forth, leaving no consolidated taxable income and a consolidated net operating loss carryover to subsequent years. The net operating loss deduction figure was composed of separate net operating loss carryovers totaling *36 $535,747 and a consolidated net operating loss carryover of $334,714. In his notice of deficiency, respondent reallocated the reported installment gain of $472,841 to Topeka. This reallocation, together with certain minor adjustments, resulted in separate taxable incomes and (losses) for Topeka and the Wherry corporations as follows: Topeka
$409,401.40
Ord
(4,069.39)
Monterey
(49,569.67)
Biggs
(1,647.27)
El Paso
(8,286.53) Proper Method to Be Used in the Application of Separate Net Operating Loss Carryovers Issue 1(b) As of June 30, 1956, Ord, Monterey, Biggs, and El Paso had total net operating loss carryovers available for use in the fiscal year ended June 30, 1957, from years for which separate returns had been filed as set forth in our findings under issue 1(a). The following table shows the year-end dates on which certain other subsidiaries of Honolulu first joined in filing consolidated returns and the separate loss carryover of each remaining for use in consolidated returns filed for the year ended June 30, 1957, and subsequent years. Loss carryover
Date of first con-
at date of
Separate loss
solidated re-
affilia-
carryover at
Subsidiary
turn
tion
June 30, 1956
Aliamanu Homes Limited
June 30, 1954
$82,144.58
0
Likins-Foster Olathe Corp.
June 30, 1955
38,545.16
$38,545.16
Topeka
June 30, 1954
87,175.00
0
Likins-Foster Salina Corp.
June 30, 1954
39,851.35
39,851.35
Cardiff Homes, Inc.
June 30, 1954
34,689.47
0
Cochiti Pumice Co.
June 30, 1955
38,764.07
0
Biggs Rental Co.
June 30, 1957
17,666.45
17,666.45 *
Foster Homes, Ltd.
June 30, 1957
1,152.78
1,152.78
*37 Honolulu had no separate loss carryover to June 30, 1954, the close of the first year for which the group filed a consolidated return, nor at June 30, 1956, the end of the year preceding the first year here in issue. Foster Development Corp. and Central Development Co., Ltd., which filed their tax returns with the consolidated group for the first time for the years ended June 30, 1957, and June 30, 1958, respectively, are not shown to have any separate loss carryovers as of the date their incomes or losses were first included in the consolidated return. Lomita Homes, Inc. (hereinafter referred to as Lomita) and Highland Park Homes, Inc. (hereinafter referred to as Highland Park) each of which joined in filing a consolidated return with Honolulu and subsidiaries for the fiscal year ended June 30, 1954, had separate net operating loss carryovers for their fiscal years ended March 31, 1954, available for use in subsequent years in the respective amounts of $66,899.32 and $13,559.22. Petitioners in computing taxable consolidated net income would apply the separate *38 loss carryover of a particular subsidiary to the separate income of that subsidiary as shown prior to determining the consolidated net income or loss. The result of the use of this method was to increase the amount of the consolidated loss carryover available for use in subsequent years over what it would have been if no separate losses had been used for years in which the consolidated group sustained a consolidated loss prior to applying the net operating loss carryover, or the amount of the separate losses used had been limited to a portion of the separate net income in those years where there was a consolidated net income composed of separate incomes of some subsidiaries and separate losses of other subsidiaries prior to applying a net operating loss carryover. Respondent determined that no separate net operating loss carryover should be used to reduce separate net income for those years in which there was a consolidated net loss prior to application of any net operating loss carryover. As of June 30, 1956, the parties differ with respect to the separate net operating loss carryovers of the following corporations, each party showing the separate loss carryovers as of that date *39 in the amount indicated: Amount of separate net loss
carryover as of June 30,
1956, available to be
carried to a sub-
sequent year
or years
Respondent's
Petitioners'
Name of sub-
determina-
computa-
sidiary
tion
tion
Lomita
$ 6,956.19
None
Highland Park
13,559.22
$12,154.82
In 1954 and 1955, the group had combined net losses before deduction of a net operating loss carryover of $224,615.30 and $245,204.10, respectively. Lomita deducted its separate net operating loss carryover from its separate net income of $20,916.36 in the fiscal year ended June 30, 1955, and absorbed the remainder of its separate net operating loss carryover by deducting it from its separate net income for the fiscal year ended June 30, 1956, and Highland Park deducted a portion of its separate net operating loss carryover from its separate net income of $1,404.40 for the fiscal year ended June 30, 1954. Respondent determined that no portion of the separate net operating loss carryover of Lomita and Highland Park could be used for the fiscal years ended June 30, 1954, and 1955 in which the combined incomes or losses of the entire group resulted *40 in a combined net loss, and that the remaining carryover of Lomita was not totally absorbed at June 30, 1956. In the fiscal year ended June 30, 1957, ten of the affiliates reported separate net incomes which totaled $660,273. Six of the affiliates reported separate net losses, which totaled $441,411.24. The combined net incomes and losses as reported by the affiliated group was an income of $218,861.76, which figure was shown on the consolidated income tax return as consolidated net income before deduction of any net operating loss. On petitioners' consolidated return, net operating losses were not applied against the consolidated net income of the affiliates as shown on the face of the return, but the separate net operating loss carryovers of affiliates having separate net incomes for the fiscal year ended June 30, 1957, were applied against the total separate incomes of such affiliates. By this method separate net operating losses totaling $447,181.50 were absorbed as shown in the following table. Separate
Net
carryover
Corporation
income
used
Aliamanu Homes, Lim-
ited
$119,788.30
None
Ord
85,752.61
$ 81,874.70
Monterey
86,092.58
86,092.58 *
Biggs Rental Co.
106,343.88
106,343.88 *
El Paso
114,580.12
114,580.12 *
Salina
39,362.84
39,362.84 *
Cochiti Pumice Co.
4,145.97
Highland Park
1,260.93
1,260.93 *
Biggs Rental Co.
20,408.67
17,666.45
Honolulu
82,537.10
None
Total
$660,273.00
$447,181.50
*41 The following table shows a summary of the method used by petitioners in applying net operating loss carryovers in their consolidated return for the fiscal year ended June 30, 1957. Total income of the 10 affiliates
showing separate gain
$660,273.00
Separate carryovers used to offset
these separate gains
447,181.50
Unabsorbed separate gains
$213,091.50
Total current operating losses of 6
affiliates reporting separate losses
(441,411.24)
Unabsorbed current losses
($228,319.74)
The unabsorbed current loss of $228,319.74 was considered by the affiliated group to be a consolidated loss for the fiscal year 1957, and it was added to consolidated loss carryovers from previous years to make up the consolidated loss carryover to the fiscal year 1958. The consolidated group employed the same method in the tax returns filed for the fiscal years ended June 30, 1958 and 1959 with the following results: 1958
1959
Total income of affili-
ates reporting sepa-
rate gain
$169,663.68
$594,375.66
Separate carryovers
used to offset these
separate gains
4,971.69
2,386.08
Unabsorbed separate
gains
$164,691.99
$591,989.58
Total current operating
losses of affiliates re-
porting losses
(161,539.29)
(40,180.19)
Excess of unabsorbed
income over losses
$ 3,152.70
$551,809.39
*42 In 1958 and 1959, there being no "consolidated loss" resulting from the application of the first two steps as described for the fiscal year 1957, the excess gain figures were reduced to zero by application of consolidated carryovers of $563,033.63 and $559,880.93, respectively, resulting in no taxable consolidated net income. Respondent attached to his notice of deficiency a lengthy schedule showing his computation of the portion of the separate losses available for use by each subsidiary which had separate income in the fiscal years ended June 30, 1957, 1958, and 1959, which, on brief, respondent says is a result of applying the following formula: (Subsidiary's separate loss carryover included in the consolidated net operating loss deduction) divided by (The total separate loss carryovers included in the consolidated net operating loss deduction) times (The consolidated taxable income for the year before deduction of the consolidated net operating loss deduction). Inclusion in Income of Parent Corporation of Capital Distributions or Redemptions of Stock by Ord, Monterey and Highland Park. Issues 1(c) and 2 As of June 30, 1955, Honolulu owned all of the outstanding *43 stock of Ord, Monterey and Highland Park. The number of shares outstanding and Honolulu's bases in the voting (class A) stock were as follows: Voting
Nonvoting
(Class A)
(Class B)
No. of
No. of
Shares
Basis
Shares
Ord
850
$ 85,000
100
Monterey
2,150
215,000
100
Highland Park
100
17,307
1,000 In accordance with an FHA requirement, each of the Wherry corporations had two classes of capital stock, class A and class B. Class A stock represented the capital required for the period beginning with construction and ending after the projects were fully constructed and class B stock represented working capital. Class A stock was callable only with approval of the FHA. Such approval was obtained with respect to the class A stock of Ord and Monterey prior to the date of the redemption by these corporations of their class A stock during the fiscal year ended June 30, 1957. During the fiscal year ended June 30, 1956, Ord and Highland Park distributed in cash to Honolulu the amounts of $238,500 and $17,478, respectively. Monterey distributed $36,000 in cash to Honolulu during that same year. For the fiscal years ended June 30, 1955 and 1956, *44 Ord, Monterey and Highland Park showed deficits in their separate earned surplus accounts contained on the balance sheets filed with the consolidated income tax returns as follows: Ord
Monterey
Highland Park
Year
Year
Year
Year
Year
Year
Ended
Ended
Ended
Ended
Ended
Ended
6/30/55
6/30/56
6/30/55
6/30/56
6/30/55
6/30/56
Separate earned
$119,188
$119,188
$123,139
$123,139
$13,559
$13,559
deficit
Consolidated
$ 40,022
$303,751
$104,837
$209,739
$ 8,895
$26,415
earned deficit
The separate income or (loss) reported by Ord, Monterey and Highland Park and the consolidated income or (loss) reported in the consolidated returns filed for the years ending June 30, 1954, 1955 and 1956 were as follows: Year Ended
Highland
June 30
Ord
Monterey
Park
Consolidated
1954
($ 8,794)
($23,877)
$ 1,404
($224,615)
1955
($27,446)
($77,656) *
($10,299)
($245,204)
1956
($28,980)
($72,090)
($ 42)
$449,800
During the fiscal year ended June 30, 1957, Ord redeemed its 850 shares of class A, common stock held by *45 Honolulu and Monterey redeemed its 2,150 shares of class A, common stock held by Honolulu paying Honolulu $70,000 and $200,000, respectively, in redemption. Ord and Monterey continued in active business after the redemption until on or about November 1, 1957, at which time their principal properties were condemned by the United States of America. For the fiscal year ended June 30, 1956, Honolulu reported taxable income of $1,024,421.12 on the consolidated return and reduced this figure by $887,527 denominated "intercompany dividends". Respondent determined that Honolulu realized additional taxable gain in the fiscal year ended June 30, 1956, of $153,671, which was the excess of the amount of cash it received from Ord and Highland Park in 1956 over Honolulu's bases in the stocks of those two corporations, and that the net operating loss carryover available at June 30, 1957, should be reduced accordingly. Respondent determined that Honolulu received longterm capital gain in the fiscal year ended June 30, 1957 on the redemption of the Ord and Monterey stock, and that, in computing such gain, Honolulu's basis in the Ord and Monterey stock should be reduced by the amounts of prior distributions *46 which were not dividends. In an amendment to his answer respondent alleged that the basis of Honolulu in the stock of Monterey should be reduced by the amounts of losses which were sustained during the years Monterey filed consolidated returns with Honolulu to the extent that such losses were availed of beyond the degree to which Monterey could have used those losses if it had filed separate returns for the respective years. The amount of losses so availed of as alleged by respondent were $95,330.54. Claimed Deductions for Legal Fees and Appraisal Fees Issue 3 (a) During the fiscal year ended June 30, 1957, Ord paid $700 and Monterey paid $2,000 as legal fees to a law firm in Washington, D.C. which represented them before the FHA in connection with the obtaining of permission to redeem stock. The same firm had been hired on previous occasions by various of the Foster interests for similar legal services. The $2,700 was deducted as business expense in the computation of the consolidated income of Honolulu and subsidiaries for the fiscal year ended June 30, 1957. Respondent determined in his notice of deficiency that the amounts paid for legal services in connection with the stock *47 redemptions should be added to the cost of the treasury stock acquired by the redeeming corporation. (b) In the taxable year ended June 30, 1958, payments were made by the partnership, T. Jack Foster & Sons, to Lytle, Johnston & Soule in the amount of $20,000, to Lewis Orgel in the amount of $1,944, and to Sincerbeaux & Shrewsbury in the amount of $5,000, all for legal services rendered. T. Jack Foster & Sons paid Lytle, Johnston & Soule the $20,000 in May 1958, in response to a bill "To fee for services rendered to all Foster Companies for the year 1956." The bill, dated May 21, 1958 was submitted by letter dated May 20, 1958. The partnership allocated $17,500 of the amount of this legal fee to Honolulu and its subsidiaries. This law firm had been counsel to the Foster organizations since 1950. Roy C. Lytle who represented petitioners at the trial of the instant case was one of the partners in this law firm. The fee paid in 1958 with respect to services performed in 1956 did not relate to the condemnations of the Fort Ord and Biggs Air Force Base projects. (c) T. Jack Foster & Sons paid Lewis Orgel, a New York City attorney, $947 on February 19, 1958, $947 on March 5, 1958 and *48 $50 on March 15, 1958, a total of $1,944. Foster considers Lewis Orgel to be an expert on condemnation law. After learning that the United States might proceed to condemn all projects built under the Wherry Act, interested project owners met in Washington and arranged for the services of Orgel to prepare an opinion on the procedure to be followed in condemnation negotiations. His fee was $1 per unit in each project and the amount paid by each of the Wherry corporations which were Honolulu's subsidiaries was allocated in that manner. Respondent in his notice of deficiency disallowed as a deduction for a business expense $500 of the payment to Lewis Orgel. The notice does not state whether this amount represented a partial disallowance of the fees allocated to each of the Wherry corporations or a total disallowance as to one of those corporations. In 1958 Monterey paid Sincerbeaux & Shrewsbury a legal fee of $5,000. This firm was counsel to Greenwich Savings Bank, the assignee under the mortgage on the Monterey project. Greenwich Savings Bank filed a cross-claim for attorneys' fees of $15,000 in the Monterey-Ord condemnation proceedings. The $5,000 was paid as a compromise settlement *49 of that claim. Respondent disallowed the deduction of the $5,000 as a business expense. T. Jack Foster & Sons paid Leonard J. Cowley $1,000 on December 6, 1957 and Biggs paid him $3,000 on February 14, 1958. Biggs also paid Marshall and Stevens $5,000 on February 14, 1958. All of these payees are professional real estate appraisers. Respondent disallowed as a deduction for a business expense the $9,000 paid to these real estate appraisers. Respondent allowed as selling expenses, in computing gain on the payments in condemnation of the Wherry projects, the $500 disallowed of the amount paid to Lewis Orgel, the $5,000 paid Sincerbeaux & Shrewsbury and the $9,000 paid to the real estate appraisers. Expenses in Connection with the Acquisition of the San Jose Project Issue 4 On June 23, 1955, T. Jack Foster & Sons, the partnership, (hereinafter sometimes referred to as Foster & Sons or Foster partnership), agreed to guarantee a bank loan of $2,100,000 which was to be obtained from Central Valley Bank by California Development Co. (hereinafter referred to as California Development), a partnership of four individuals which had no connection with Honolulu or any of its subsidiaries, *50 for the purpose of acquiring and developing land near San Jose, California. Foster & Sons was to receive as consideration $500 for each house and lot sold by California Development plus $150 per house from "water refunds." California Development defaulted on the bank loan. The "default" of California Development was precipitated by Foster's discovery of bad faith dealings on the part of California Development, such as bloating the book cost of assets by transferral through straw parties. Foster threatened to have the bank foreclose on the loan if California Development continued with the project. California Development, on July 26, 1956, transferred all interest in the San Jose property to Foster, who transferred it to Lomita. Foster and Lomita each assumed the liabilities of California Development with the transfer of the assets. Lomita gave its note to the bank to cover the indebtedness of California Development, which at the time was $536,221.97, including interest of $66,257.30 charged on August 1, 1955 and interest of $14,687.32 charged on June 13, 1956. California Development had obtained FHA and FNMA commitments on the project for which a fee was charged which would have *51 permitted the borrower to draw a stated amount as the project progressed. The full amount of the loan had not been drawn by the borrower when Lomita acquired the assets. The portion of the commitment or loan application fee applicable to this unused amount was $38,215.80. Since the entire commitment fee had been deducted from the loan when it was made, the loan assumed by Lomita included the $38,215.80 portion of the commitment fee applicable to the undrawn portion of the loan. The officers of Lomita decided that the existing development plan was not a good one and scrapped the plan. Because of this change of plans Lomita received no benefit from the portion of the commitment fee applicable to the unused portion of the loan. Lomita incurred an expense of $1,650.62 in the fiscal year ended June 30, 1957, for engineering fees and related costs in connection with the new plans which were drawn up after the original ones were scrapped. Petitioners claimed a deduction of $120,811.04 as "interest expense" of Lomita in the fiscal year ended June 30, 1957, composed of the following amounts: Administration and miscellaneous
San Jose operations
$ 66,257.30
Administration and interest San Jose
operations
14,687.32
FHA and FNMA commitment fees
38,215.80
Other costs of project
1,650.62
$120,811.04
*52 Respondent disallowed the deduction and determined that the $120,811.04 should be allocated to the basis of the units in the San Jose project and allowed additional cost-of-sale deductions in each of the years here involved because of this adjustment in the following amounts for the years indicated: Year ended
Additional
June 30
cost of sale
1957
$ 2,793.32
1958
53,771.41
1959
48,883.10
$105,447.83
Deductions for Travel and Entertainment Expenses Issue 5 The various Foster organizations operated over a wide georgraphic area, with projects in Kansas, Texas, California, Hawaii, and other widely distant locations. Travel expenses for officers and employees of the various corporations were incurred in each year here in issue in carrying on the affairs of the various corporations. When the United States began condemnation proceedings against the Fort Ord and Biggs Air Force Base projects, Foster went with certain of his employees to Fort Ord and Biggs Air Force Base to inventory items of personal property (such as water heaters and refrigerators) which were kept at the location of those projects for replacement and to repair those items in the various *53 units of the project, which were in present need of repair. The personal property was part of the property under condemnation. Foster carried cash on these occasions and paid in cash for repair parts needed for repair work but not contained in the inventory at the project location, because local dealers would not extend credit to the Wherry corporations in light of the pending condemnations. At the same time, inspection of all housing units was made jointly by a Foster employee and a Government employee, to determine the general condition of each unit involved in the condemnation negotiations. Because of the work done in this respect by Foster and his employees the condemnation award was from $25,000 to $30,000 higher than it would otherwise have been. Employees who traveled for the Foster corporations were usually reimbursed by the Foster partnership. During the years 1956 through 1959 the Foster partnership expended the following amounts for travel and entertainment and allocated the indicated part of the amounts so expended to Honolulu: Calendar
Paid by T.
Charged to
Claimed by
year ended
Jack Foster
Likins-Foster
T. Jack
December 31 *
& Sons
Honolulu Corp.*
Foster & Sons
1956
$ 5,749.86
None
$ 5,749.86
1957
22,854.20
$20,082.89
2,771.31
1958
20,301.50
10,000.00
10,301.50
1959
15,981.78
None
15,981.78
*54 Respondent in his notice of deficiency disallowed deductions totaling $8,444 in the fiscal year of Honolulu and subsidiaries ended June 30, 1958, as follows: Honolulu
$4,344
Ord
800
Monterey
800
Biggs
1,300
El Paso
1,200 Of the total of $4,100 deductions claimed by the Wherry corporations disallowed by respondent, he allocated $1,500 as expenses of sale in computing the gain to Biggs and El Paso on the condemnation of the El Paso-Biggs project, increasing the basis of the project by that amount. Respondent in his notice of deficiency disallowed $15,960.61 of the expense for travel and entertainment claimed as a deduction on the consolidated return of Honolulu and subsidiaries for the fiscal year ended June 30, 1959, as not representing ordinary and necessary business expenses. The amount of $10,000 included in this disallowance of $15,960.61 is the $10,000 portion of travel and entertainment expenses paid by the Foster partnership in the calendar year 1958 and allocated to Honolulu in its fiscal year ended June 30, 1959. Gains *55 from Condemnation Issue 6 Ord and Monterey entered into agreements with the Secretary of the Army in 1951 and 1952, respectively, in accordance with the provisions of the Wherry Act for the lease of land and construction of 500 houses each at Ford Ord Military Reservation, Monterey County, California. Biggs and El Paso entered into similar lease agreements in 1950 with the Secretary of the Air Force for projects at Biggs Air Force Base, El Paso County, Texas, for the construction of 400 houses each. Construction was performed in accordance with the contract between the lessee corporations and T. Jack Foster and V. B. Likins, partners. The construction was financed under Title VIII of the National Housing Act as in effect prior to the enactment of the Housing Amendments of 1955. The four leases were similar. Each was for a term of 75 years, at an annual rental of $100. The leases were subject to termination on default and were expressly for the purpose of erecting, maintaining and operating housing projects in accordance with plans and specifications set forth by the contracting department and the Federal Housing Commissioner. Use and occupation of the houses constructed were *56 subject to rules and regulations set forth by the Commanding Officer of the post or base. The Monterey lease provided for termination without cause, but only after 50 years and 6 months of the term had expired and the FHA mortgage interest had terminated. The other three leases did not provide for termination without cause. On October 30, 1957, the United States filed in the United States District Court for the Western District of Texas a complaint in condemnation and declaration of taking against Biggs and El Paso and deposited $2 as estimated just compensation. The deposit was increased on June 6, 1958, by $337,998 representing $171,500 for Biggs and $166,500 for El Paso. The District Court entered judgment on the date of filing that title to the property was in the United States and that just compensation therefor would be ascertained and awarded in the proceeding before it. A similar complaint and declaration of taking were filed on November 1, 1957, in the United States District Court for the Northern District of California against Ord and Monterey with respect to the Ord-Monterey project and a deposit of $782,053 was made as estimated just compensation of $318,827 for Monterey *57 and $463,226 for Ord. Each complaint and declaration of taking filed in the above actions alleged that the United States was proceeding under 46 Stat. 1421, 40 U.S.C. 258a and that the "estate," or "property," taken was all right, title and interest of the Wherry corporations arising out of their leases from the Government, together with improvements thereon, and "subject to the interest of" the mortgagee or mortgagees. The encumbrances on the property were listed in the allegations of the complaints and declarations. The Wherry corporations each filed a notice of appearance shortly after the complaints and declarations of taking had been filed in which each stated that it made no objection to the taking of its property, but demanded a jury trial as to just compensation. None of the Wherry corporations reached a voluntary settlement with the United States on the issue of just compensation prior to the rendition of jury verdict and judgment. The Biggs and El Paso projects had been financed through deeds of trust (referred to herein as mortgages) to the benefit of the Republic National Bank of Dallas which mortgages were later assigned to the New York Life *58 Insurance Co. (hereinafter referred to as NYLIC). The Ord project had been financed by a deed of trust and a chattel mortgage through the same bank and both were assigned to NYLIC. The Monterey project was financed through a deed of trust and two chattel mortgages to the same bank and all were ultimately assigned to the Greenwich Savings Bank, New York City (hereinafter referred to as Greenwich). The amounts of principal due on each of the mortgages at the date the condemnation suits were filed and amounts on deposit with the mortgagee in escrow and as prepayments with respect to each mortgage were: Escrow and
Principal Due
prepaid amounts
Ord
$4,017,879.35
$167,787.43
Monterey
4,101,516,41
109,919.48
El Paso
3,182,707.04
212,014.45
Biggs
3,182,707.04
211,218.05
$700,939.41
The books of the Wherry corporations showed the following adjusted bases in the condemned assets on the date the condemnation suits were filed: Ord
$3,342,983.40
Monterey
3,494,850.61
Biggs
2,672,706.50
El Paso
2,654,696.72
Greenwich, pursuant to rights which it had as assignee, filed a cross-claim in the District Court for the Northern District *59 of California against Monterey for $15,000 attorneys fees on April 10, 1958. This claim was settled in June 1958 for $5,000. Greenwich withdrew its counterclaim and any claim to any compensation due Monterey by stipulation filed August 18, 1958. At some time subsequent to the commencement of the condemnation suit, the United States Government, acting through the Federal Housing Commissioner, and either the Secretary of the Army or the Air Force, entered into "three-party agreements" with NYLIC and Greenwich, which were executed "as of December 27, 1957" and "as of November 1, 1957" in which the United States assumed the liabilities of the Wherry corporations to the mortgagees. These documents bear acknoledgmeent dates as follows: Assumption of
Secretary of Army
Federal Housing
NYLIC or
liability of -
or Air Force
Commissioner
Greenwich
Ord
Mar. 3, 1958
Mar. -, 1958 *
Feb. 21, 1958
Monterey
June 23, 1958
July 8, 1958
June 17, 1958
Biggs
Dec. 27, 1957
Jan. -, 1958 *
Jan. 16, 1958
El Paso
Dec. 27, 1957
Jan. -, 1958 *
Jan. 16, 1958
The Wherry corporations did not sign these documents. Supplemental *60 agreements were submitted to Biggs and El Paso by NYLIC which stated that in consideration of the assumption by the United States of the mortgages, NYLIC would release Biggs and El Paso of their liability. NYLIC signed these agreements under acknowledgment of June 5, 1958, and transmitted them to Biggs and El Paso under cover letters dated July 11, 1958. By letter dated July 14, 1958, counsel to Biggs and El Paso declined for his client to execute the proposed agreements, stating as a reason that the corporations were protected by the three-party agreements. The consolidated group did not report any income from the condemnations in the return filed for the fiscal year ended June 30, 1958. NYLIC disclaimed any interest in the Biggs-El Paso proceeding at some time prior to August 20, 1958, and in the Ord-Monterey proceeding by a stipulation dated January 30, 1958, and filed August 18, 1958. On August 19, 1958, Ord and Monterey filed motions for withdrawal of the funds deposited by the United States in court. Biggs and El Paso filed similar motions on August 20, 1958. An order for the payment of deposits of $463,226 and $318,827 to Ord and Monterey, respectively, was entered by *61 the United States District Court in California on August 21, 1958. Those amounts were withdrawn pursuant to the order on August 27, 1958. An order for the payment of $171,500 and $166,500 to Biggs and El Paso, respectively, was entered by the United States District Court in Texas on August 25, 1958. Those amounts were withdrawn pursuant to the order on September 2, 1958. The cash withdrawn from the courts was deposited in Honolulu's bank account. Plans of liquidation were adopted on August 11, 1958, by each of the Wherry corporations. From and after February 10, 1958, as heretofore set forth, the stock ownership of each of the Wherry corporations was 79 1/3 percent in Honolulu, 15 1/2 percent in Foster, and 1-13/18 percent in each of the three Foster sons. The Wherry corporations each reported the adoption of the plan of liquidation on its separate Federal income tax return for its taxable year ended June 30, 1959, as a liquidation under section 337(a). Each statement related that the principal asset of the corporation was leasehold improvements on which condemnation proceedings were under way, that certain deposits had been received by them during the year but that gain could not *62 yet be computed and, if it could, it was not taxable to the corporations. The liquidations were completed on August 8, 1959. On January 21, 1960, a jury verdict was returned in the California District Court condemnation proceeding that the just compensation due Ord and Monterey for their property taken by the United States Government was $1,106,000. On December 4, 1959, the parties had filed a stipulation with the Court in accordance with which a written pretrial order and judgment had been entered that the United States pay Monterey $22,006.16 for prepaid premiums on mortgage insurance and escrowed deposits and pay Ord $16,641.20 for prepaid premiums on mortgage insurance. On January 13, 1960, the Court had entered an order that the United States pay Monterey and Ord, for proration between them, $49,534.58 as compensation for personal property taken from those two corporations on November 1, 1957. Determination of interest on the amounts to be paid for prepaid premiums and escrow deposits was reversed. Ord and Monterey filed a motion for a new trial which was denied on June 22, 1960. The judgment of the Court in accordance with the jury verdict was entered on June 23, 1960. A *63 consolidated order of payment was entered June 29, 1960, which briefly recapitulated the amounts paid to and the amounts remaining due Ord and Monterey under all judgments. The parties had stipulated that the trial and award be joint and that Ord and Monterey would prorate the joint award as they saw fit. The consolidated order noted that the total amount of all judgments was $1,194,181.94 and that interest was due on part of that amount. The Court ordered payment by the United States to Ord and Monterey of $467,813.14, the amount remaining due to them including interest. Ord and Monterey appealed from the decision of the District Court to the United States Circuit Court of Appeals for the Ninth Circuit. The Circuit Court affirmed the judgment of the District Court on October 1, 1962. The amount of $467,813.14 remaining due to Ord and Monterey under the judgment and order of payment of the District Court is computed as follows: Total compensation due Monterey and Ord for
taking of property
per the verdict of the jury
$1,106,000.00
Amount due Monterey and Ord for taking personal
49,534.58
property
Due Monterey and Ord for mortgage insurance paid
38,647.36
Total due Monterey and Ord as of 6-29-60
$1,194,181.94
Amount previously paid
782,053.00
Balance due 6-29-60, exclusive of interest
consisting of: (1) Additional just compensation awarded by
jury
$323,947.00
(2) Agreed amount due for taking of personal
property
49,534.58
(3) Mortgage insurance refund due Monterey
and Ord
38,647.36
Total principal due
$ 412,128.94
Add: (1) Interest at 6% on $373,481.68 from November
1, 1957;
and
(2) Interest at 6% on $38,647.36 from January 13,
55,684.20
1960
Total ordered paid June 29, 1960
$ 467,813.14
*64 The District Court in Texas entered a judgment pursuant to a jury verdict in the Biggs-El Paso case on August 7, 1962, in favor of Honolulu, Foster, and Foster's sons in the amount of $1,700,000. The shareholders of Biggs and El Paso had been made parties defendant after liquidation of Biggs and El Paso under the plan of liquidation adopted August 11, 1958. Since the United States had previously deposited $338,000 in court, the amount ordered to be paid was $1,362,000 plus interest. The United States deposited $1,765,920.57 with the Court on August 15, 1962, and that amount was withdrawn by the shareholders of Biggs and El Paso on August 29, 1962. Neither Honolulu and subsidiaries nor Ord, Monterey, Biggs, or El Paso in separate returns reported any income from gain on the condemnation of the properties of the Wherry corporations in any of the years here in issue. Respondent in his notice of deficiency determined that Honolulu and subsidiaries received income for their fiscal year ended June 30, 1958, in that each of the Wherry corporations had a gain at the date of the filing by the United States of the complaint and declaration against it to the extent of the excess of the *65 mortgage indebtedness on its property over its basis therein. Respondent also determined that each of the Wherry corporations had income in its fiscal year ended June 30, 1959, from gain on the condemnation when it withdrew deposits from escrow and determined that Honolulu, Foster, and Foster's sons were liable as transferees for the amounts of these deficiencies plus interest. Respondent also determined that Monterey and Ord each had a gain in its separate fiscal period from February 11 through June 30, 1958, from the condemnation of its properties to the extent of the excess of the balance due at the date of filing of the complaint and declaration on its mortgages on its properties over its basis therein and that Honolulu, Foster, and Foster's sons were each liable as transferees for the deficiencies so determined. Respondent recognized that this determination was a duplication of the deficiencies determined against Honolulu and subsidiaries for the fiscal year ended June 30, 1958, because of this same transaction. Claimed Administrative Expense Deduction Issue 7 Honolulu acquired a leasehold in Honolulu, Hawaii, [5] and built a housing project of 250 houses, called Harbor *66 Heights, thereon. Honolulu acquired a second leasehold on which 525 houses were built. This project was called Foster Village. Foster Village was developed by Foster Development Corp. (hereinafter referred to as Foster Development) and the construction was done by Foster Homes, Ltd. (hereinafter referred to as Foster Homes). Foster negotiated the leases and obtained the financing for Harbor Heights and Foster Village. He personally guaranteed the financing on the two developments. Interim financing was obtained from the Republic National Bank of Dallas and the Bishop National Bank. Permanent financing was obtained through FNMA. The permanent financing on Foster Village was approximately $5,000,000. Foster personally advanced some funds in connection with the development of Harbor Heights and Foster Village. Foster Homes was incorporated on December 13, 1955, under the laws of Delaware with $10,000 paid-in capital on 1,000 common shares. Foster Development was incorporated on February 13, 1956, under *67 the laws of Delaware with $10,000 paid-in capital on 1,000 common shares. Honolulu owned all of the outstanding stock of both of these corporations. The books of Honolulu, Foster Development, and Foster Homes show the following adjusting journal entries as of June 30, 1959: Corporation charged
Expense charged
or credited
or credited
Amount
Honolulu
Finance fees
$ 50,000.00
Honolulu
Finance fees
30,000.00
Honolulu
Administrative expense
(100,000.00)
Foster Development
Administrative expense
105,000.00
Foster Homes
Administrative expense
75,000.00
Foster Homes
Interest expense
22,648.93
Foster Homes
Other corporate expense
142,351.07
$325,000.00 The amount of $325,000 represents payments of $50,000 to Foster in December 1958, of $200,000 to Foster on June 30, 1959, and of $75,000 to Foster & Sons for the year ended June 30, 1959. Foster reported the payments to him as income on his personal income tax returns for the years 1958 and 1959 and Foster & Sons reported the payment to it on its partnership return of income for the year 1959. The returns for the taxable years ended June 30, 1957, 1958, and 1959 filed by the various corporate *68 petitioners disclose no salary paid to Foster. Foster received no salary from Foster Homes or Foster Development during any period here pertinent. On the consolidated income tax return filed for the fiscal year ended June 30, 1959, deductions were claimed in the total amounts of $260,000 for administrative expense, $22,648.93 for interest, and $142,351.07 for "other corporate expenses." In his notice of deficiency respondent disallowed these deductions stating "they do not represent ordinary and necessary business expense" and they "do not represent an allowable deduction." Since respondent determined that the reduction by Honolulu of its administrative expense by $100,000 was improper, he increased the deduction of Honolulu by $100,000, making a net disallowance of $325,000 of administrative expense for Honolulu and subsidiaries for their fiscal year ended June 30, 1959. Whether Honolulu Had a Gain from Distributions in Liquidation by the Wherry Corporations Issue 8 The amounts of the deposits with the United States District Courts in Texas and California withdrawn in August and September 1958 with respect to the various projects were as follows: Cor-
Date of
Amount
poration
Withdrawal
Withdrawn
Ord
August 27, 1958
$ 463,226.00
Monterey
August 27, 1958
318,827.00
Biggs
September 2, 1958
171,500.00
El Paso
September 2, 1958
166,500.00
Total
$1,120,053.00
*69 The cash was deposited in Honolulu's bank account and appropriate credit made on Honolulu's books to Foster who owned 15 1/2 percent of the stock of each Wherry corporation and to his sons who together owned 5 1/6 percent. Upon receipt of the cash, Honolulu entered on its books a credit of $888,576.13 to "Gain on Sale of Assets," which represented its 79 1/3 percent share of the total amounts withdrawn from the courts. As of June 30, 1959, Honolulu debited "Gain on Sale of Assets" by $888,576.13 and "credited intercompany amounts due to El Paso and Biggs of $134,073.45 each, and Ord and Monterey, $310,214.62 each." All the assets of each of the Wherry corporations were distributed to its shareholders on or before August 8, 1959. The balance sheets attached to the Federal income tax returns filed by Ord, Monterey, Biggs, and El Paso for the taxable period February 11 through June 30, 1958, and the fiscal year ended June 30, 1959, show deficits in earned surplus at the date and in the amounts as follows: February
June
June
10, 1958
30, 1958
30, 1959
Ord
$674,681.99
$675,894.96
$681,232.24
Monterey
602,121.27
603,856.64
611,068.55
Biggs
523,435.00
524,034.80
524,304.79
El Paso
555,469.45
555,870.76
555,824.48
*70 The balance sheets attached to the Federal income tax returns of the Wherry corporations for the fiscal year ended June 30, 1959, show, in addition to mortgages payable which were with respect to the properties condemned by the United States, reserve for depreciation and capital surplus (which was used by respondent to reduce the book bases of the leasehold assets condemned to eliminate increases made in the bases of those assets which increased bases were credited to capital surplus), only the following liabilities as of June 30, 1959: Accounts and
Capital stock
notes payable
Accrued taxes
Sec. 337 gain
class B
Ord
$101,353.71
None
None
$15,000
Monterey
31,687.15
None
None
15,000
Biggs
52,531.65
$25,986.88
$13,157.66
15,000
El Paso
81,800.00
25,983.41
1,598.38
15,000 The only difference in these liabilities and those shown as of June 30, 1958 was that accounts and notes payable were shown by these corporations as of the earlier date in the respective amounts of $95,394.54, $91,188,38, $103,729.52 and $101,577.04 and Biggs and El Paso showed no "Section 337 Gain." Honolulu on its consolidated income tax return for the fiscal *71 year ended June 30, 1959, did not report any gain from the receipt of its share of the amounts withdrawn from the courts in August and September 1958. Respondent, in his notice of deficiency, determined that Honolulu received $888,576.13 from the Wherry corporations as distributions in liquidation during its fiscal year ended June 30, 1959 and that Honolulu's adjusted basis of the stock of these corporations was zero. Respondent, therefore, considered the entire $888,576.13 to represent a capital gain to Honolulu. Transferee Liability Issue 9 After withdrawal of deposits from the United States District Courts in California and Texas where the condemnation proceedings were pending, the Wherry corporations deposited in Honolulu's bank account the amounts of such withdrawals which were credited to the shareholders of the Wherry corporations by Honolulu as follows: Amounts withdrawn from escrow account of
Ord
Motereyy
Biggs
El Paso
Total
$463,226.00
$318,827.00
$171,500.00
$166,500.00
$1,120,053.00
Credited
to: Honolulu -
$367,492.63
$252,936.09
$136,056.67
$132,090.00
$ 888,575.39 *
79 1/3
percent
T. Jack
71,800.03
49,418.19
26,582.50
25,807.50
173,608.22
Foster -
15 1/2
percent
T. Jack
7,977.78
5,490.90
2,953.61
2,867.50
19,289.79
Foster,
Jr. - 1
13/18
percent
John R.
7,977.78
5,490.91
2,953.61
2,867.50
19,289.80
Foster - 1
13/18
percent
Richard H.
7,977.78
5,490.91
2,953.61
2,867.50
19,289.80
Foster - 1
13/18
percent
$463,226.00
$318,827.00
$171,500.00
$166,500.00
$1,120,053.00
*72 Honolulu received the Ord-Monterey and Biggs-El Paso cash distributions on August 27, and September 2, 1958, respectively. The individual shareholders received their credits for their portions of the distributions from all the Wherry corporations on September 5, 1958. By August 8, 1959, all the assets of the Wherry corporations, including the claim of each such corporation against the United States Government in connection with the condemnation proceedings had been distributed to its shareholders. These claims of the Wherry corporations against the United States were satisfied at the times and in the amounts as follows: Remaining just compensation
Date
Principal
Interest
Ord
Monterey
July 6, 1960
$ 412,128.94 *
$ 55,684.20
Biggs
El Paso
August 29, 1962
$1,362,000.00
403,920.57
*73 Prior to the entry of the final order of the courts for payment to the Wherry corporations, the parties to the two condemnation proceedings had agreed at pretrial conferences that the two housing projects involved in each proceeding would be deemed one and that the final award would be one sum to be prorated by the respective corporations by agreement between them. Each corporation, or its distributees, received one-half of the final award in the proceeding to which it or they were a party, as follows: Principal
Interest
Total
Ord
$206,064.47
$ 27,842.10
$233,906.57
Monterey
206,064.47
27,842.10
233,906.57
Biggs
681,000.00
201,960.28
882,960.28
El Paso
681,000.00
201,960.29
882,960.29
Respondent determined that Honolulu, Foster, and Foster's three sons were liable as transferees of Ord, Monterey, Biggs and El Paso in the amounts set forth heretofore and by amendments to answer increased or reduced the amounts as determined in his notices of liability as heretofore set forth. Ultimate Facts Honolulu, Foster, and Foster's three sons are liable as transferees of the assets of the Wherry corporations for any Federal income taxes and interest *74 thereon due by those corporations for the years here involved to the extent of the respective distributions from those corporations credited to them on September 5, 1958, from the distributions made by the Wherry corporations of amounts withdrawn in August and September 1958 from the deposits made by the United States with the courts in which the condemnation proceedings were pending plus the fair market value at the date of distribution of the claims of the Wherry corporations against the United States. Respondent has not shown that the fair market value at the date of distribution of the claims of the Wherry corporations against the United States, which claims were distributed by the Wherry corporations to their stockholders on or before August 8, 1959, exceeded the amount of $88,181.94 determined to be payable for mortgage insurance and escrowed funds and personal property of Ord and Monterey which represented distributions from Ord and Monterey in accordance with the amounts allocated to each in the stipulation agreement and court order with respect to those payments. Opinion Reallocation of Gain on Sale of Topeka Houses Issue 1(a) Section 482 [6] authorizes the Commissioner *75 to reallocate income or deductions among related organizations, if necessary, to prevent evasion of taxes or clearly to reflect income. Respondent's regulations provide that section 482 applies in the case of any controlled taxpayer, whether such taxpayer makes a separate return or a consolidated return. If a controlled taxpayer is a party to a consolidated return the "true consolidated taxable income of the affiliated group and the true separate taxable income of the controlled taxpayer are determined consistently with the principles of a consolidated return." *76 Respondent takes the position that the sole purpose in the transfer by Topeka of the houses to Ord, Monterey, Biggs, and El Paso was to shift to those corporations income which otherwise would have been realized by Topeka in order that the corporations to which the houses were transferred might realize separate income against which to offset separate net operating loss carryovers part of which would expire if not used in the fiscal year ending June 30, 1957. Petitioners argue that there was a business purpose in Topeka's disposing of its houses and that the gain on Topeka's transfer of the houses to the Wherry corporations is properly eliminated as an intercompany transaction under Sec. 1.1502-31(b)(1)(i), Income Tax Regs.
Petitioners' argument does not answer the contention of respondent that the transfer of the houses from Topeka to the Wherry corporations had no purpose other than tax evasion. Assuming that petitioners have shown a business purpose in Topeka's disposing of its houses, they have shown no business reason why the sales of these houses to persons outside the affiliated group should not have been made by Topeka instead of the Wherry *77 corporations. It is unlikely that Topeka would have sold the houses to an unrelated purchaser for the price at which it transferred them to the Wherry corporations, since those corporations immediately sold the houses to unrelated parties at a substantial profit. However, even if it be assumed that the transfer value placed on the houses was a fair one, the fact that the transfer by Topeka to the Wherry corporations was an intercompany transfer on which gain is eliminated in filing a consolidated return would nevertheless permit evasion of tax by the transfer. Since there was available to the Wherry corporations separate net operating loss carryovers not available to Topeka, the fact that the entire profit on the sale of the houses to persons outside the affiliated group, as distinguished from only the portion of the profit above the amount used by Topeka as a transfer value, was income of the Wherry corporations enabled those corporations to handle the sales to outsiders in such a way as to make the separate income of each approximate the separate net operating loss carryover available to each. As soon as the Wherry corporations had sold the houses and realized a gain which caused *78 them to have separate incomes, the installment notes taken in part payment for the properties were assigned to the common parent of Topeka and the Wherry corporations. In effect, Topeka made only a temporary transfer of the properties to the Wherry corporations to enable the Wherry corporations to use such properties temporarily to receive income to the extent of their separate net operating losses. The temporary transfer of an income-producing asset primarily for the purpose of avoiding tax by making use of a net operating loss of the transferee has been held to justify the reallocation of income and deductions under section 482. Spicer Theatre, Inc. v. Commissioner, 346 F. 2d 704 (C.A. 6, 1965), affirming 44 T.C. 198, and Ballentine Motor Co. v. Commissioner, 321 F. 2d 796 (C.A. 4, 1963), affirming 39 T.C. 348. The fact that Topeka transferred houses in unequal numbers to the Wherry corporations which sold them at amounts resulting in separate taxable income to each of approximately the amounts of the net operating loss carryover of each [7] gives a strong inference of a tax evasion purpose. Petitioners contend that the reason for *79 the transfer was partly because the Wherry corporations were seeking financing for new projects in California and Texas and inclusion of the sales profits on their financial statements would improve their borrowing positions and partly because a high rate of default on the part of the ultimate purchasers of the houses was a possibility and the transfer of the houses by Topeka would insulate the group against deficiency judgments under Kansas law. Neither of these arguments is persuasive. There is nothing in the record to show that the Wherry corporations could not obtain financing for any projects they were contemplating developing despite their tax loss carryovers. These corporations had successfully constructed housing projects at two different military bases and during the years in issue derived the major portion *80 of their income from rentals. Large depreciation deductions were claimed in each year, which resulted in income deficits for tax purposes but the indication from the record is that the market value of the assets of the Wherry corporations was substantially in excess of their liabilities so that each of the Wherry corporations had a substantial true net worth. Furthermore, the lack of any intent to improve the financial position of the Wherry corporations by the transfer of the houses to them may be inferred from the fact that the contract obligations received from the sales of the houses were transferred to Honolulu after the sales were complete and sufficient income realized by the Wherry corporations to permit use of their separate net operating loss carryovers. Petitioners' argument that the transfer of the houses to the Wherry corporations would protect Topeka against loss on deficiency judgments, should the purchasers default, is also unpersuasive. The Wherry corporations did not assume any liability on the first mortgages, but Topeka was liable on them. Petitioners have made no showing of why a deficiency judgment could not be had against Topeka, even though Topeka had transferred *81 the houses to the Wherry corporations. If Topeka was without assets after its transfer of the houses, such a situation could result only from the fact that Topeka received no consideration for the transfer of the houses or disposed of the consideration received by transfer to an affiliate without adequate consideration. If Topeka made a transfer of its assets for inadequate consideration, it would appear that a creditor of Topeka might proceed against Topeka's transferees. Petitioners have certainly not shown otherwise. We conclude from all the facts in the record that the primary purpose for the transfer by Topeka of the houses to the Wherry corporations prior to the sale of the houses to unrelated purchasers, was to enable the Wherry corporations to make use of their separate net operating loss carryovers and, thus, to avoid tax. Therefore, under the holdings in Spicer Theatre, Inc. v. Commissioner, supra, and Ballentine Motor Co. v. Commissioner, supra, respondent is within his authority under section 482 in reallocating gain on the sale of the houses to Topeka unless the fact that Topeka and the Wherry corporations all joined with their common parent, *82 Honolulu, in filing consolidated income tax returns causes the holding in those cases to be inapplicable here. The rationale of permitting the filing of a consolidated return by affiliated corporations is that a business, though fragmented in different legal units, may be a single economic entity and should be allowed the benefits for income tax purposes of a single economic entity. The rationale of the allowance of deductions of a net operating loss carryover is that the vicissitudes of a single business' "lean and fat" years may be averaged out to some extent. That affiliates filing a consolidated return are not viewed as a "single business" for the purpose of a net operating loss carryover from years before the consolidation or for any particular affiliate for years before it entered the consolidation is shown by the regulations [8] which provide for the use of net operating loss carryovers from a year in which an affiliate filed a separate return only to the extent of the separate income of that affiliate included in the consolidated net income for the year to which the loss is being carried. Since the corporate petitioners agreed to accept these regulations, [9] in order to obtain *83 the privilege of filing consolidated returns, the regulations control and allow the separate net operating loss carryovers of the Wherry corporations from years for which they filed separate returns to be used only to the extent of their incomes included in the consolidated return. Although affiliated corporations are permitted to file consolidated returns, they "are separate entities for the purpose of net operating loss deductions." Frelbro Corporation, 36 T.C. 864, 877, (1961), reversed on another issue 315 F. 2d 784 (C.A. 2, 1963). Where consolidated returns are filed and there is an attempt to carry a loss from a separate return year to a consolidated year (or to carry a loss from a consolidated year to a separate return year), the limitation that the loss of "one business" may not be used to average out the "income of some other business" is determined strictly under the regulations by considering each separate corporation as a separate "business." A. R. Ruppert Plumbing & Heating Co., 39 T.C. 284 (1962). Here, as in the Ruppert Plumbing & Heating Co. case, the facts "do not warrant a finding" that the businesses carried on by Topeka and *84 the Wherry corporations were in substance "the same business." It is, therefore, unnecessary to consider whether if the business were in substance the same, respondent's regulations could be interpreted to permit the loss carryovers of the Wherry corporations to offset income of Topeka. *85 Since the separate loss carryovers of the Wherry corporations cannot be used to offset income of Topeka included in the consolidated income for the fiscal year ended June 30, 1957, it follows that "true consolidated taxable income of the affiliated group" and the "true separate taxable" incomes of Topeka and the Wherry corporations determined "consistently with the principles of a consolidated return" ( Sec. 1.482-1(b)(2) Income Tax Regs.), requires that Topeka not be permitted in effect to shift its separate income for the fiscal year 1957 to the Wherry corporations. We, therefore, sustain respondent's determination reallocating the gain on the sale of the houses which Topeka transferred to the Wherry corporations to Topeka under section 482. Since we have sustained respondent's reallocation of income under section 482, it is unnecessary to consider his alternative contention that if the gain on the sale of the houses is properly that of the Wherry corporations for income tax purposes, it constitutes ordinary income and not capital gain. Method of Applying Separate Net Operating Loss Carryovers Issue 1(b) The first difference between the parties *86 with respect to proper application of separate loss carryovers of some of the affiliated corporations to the separate incomes of those corporations concerns the fiscal years ended June 30, 1954 and 1955, in each of which the affiliated group had a consolidated net loss prior to application of net operating loss carryovers. The determination of the application of the loss carryovers in the fiscal years ended June 30, 1954 and 1955 is necessary in order to ascertain the amount of separate net operating loss carryovers of certain affiliates and the consolidated net operating loss carryover available for use in the fiscal year ended June 30, 1957, the first year in issue in this case, and subsequent years. Petitioners take the position that the separate net operating loss carryover of a particular subsidiary that had separate net income could be used to apply against that subsidiary's separate net income, thereby increasing the overall net operating loss carryover of the consolidated group even though the consolidated group had a consolidated loss prior to application of any net operating loss carryover. Respondent contends that in years in which the consolidated group had a consolidated *87 net loss prior to application of a net operating loss carryover, no separate net loss carryover of any affiliate may be used. This precise issue was involved in Phinney v. Houston Oil Field Material Company, 252 F. 2d 357 (C.A. 5, 1958). That case was concerned with consolidated returns filed under Treasury Regulations issued under the Internal Revenue Code of 1939, but the section dealing with the carryover and carryback of separate net operating losses was substantially the same as section 1.1502-31(b)(3) of the regulations applicable to the years involved in the instant case. [10] In Phinney v. Houston Oil Field Material Company, supra, the Court held the consolidated net operating loss of an affiliated group could not be increased by first using the separate net operating loss of an affiliate which had separate income to offset the income of the affiliate. In so holding the Court stated that to allow such an increase in the consolidated net operating loss would be contrary to the regulation which states that the "net income of an affiliate for consolidated return purposes shall be computed without benefit of a net operating loss deduction." Section 1.1502-31(b)(1)(ii), Income Tax Regs. *88 , applicable to the years here in issue in substance contains the same provisions, and Section 1.1502-31(a)(1) provides that the "consolidated taxable income shall be the combined income of the several affiliated corporations" minus "any consolidated net operating loss deduction." We agree with the reasoning in the Phinney case. Unless there is consolidated net income prior to the use of any net operating loss carryover, there is no income of the consolidated group against which to apply a carryover and therefore no reason for application of a carryover. We therefore sustain respondent in his determination that the separate loss carryovers may not be applied against the separate incomes of the corporations having such separate carryovers in years in which there was a consolidated net operating loss prior to the application of any net operating loss carryovers. The second problem as to the application of loss carryovers deals with the use of separate net operating loss carryovers in years when there was net income *89 of the consolidated group prior to application of net operating loss carryovers. The only provision of the regulations with respect to this problem is that the amount of a separate net operating loss carryover which may be used shall not exceed the separate net income of the particular affiliate having the separate net operating loss carryover. However, the same reasoning applied in holding that no separate net operating loss carryover may be used in a year in which there is no consolidated net income prior to the use of any net operating loss carryover, leads to the conclusion that the amount of the consolidated net income prior to the use of any net operating loss carryover is the limitation on the total amount of net operating loss carryover that may be used. As an example, on the basis of the returns as filed by petitioners which showed a consolidated net income for the fiscal year ended June 30, 1957, prior to the use of any net operating loss carryover, in the amount of $218,761.76, we would conclude that net operating loss carryovers in excess of this amount could not be used. [11] Having determined this limitation on the total amount of net operating loss carryover which may *90 be used for the fiscal year ended June 30, 1957, it becomes necessary to determine what portion of this total may constitute separate loss carryovers of affiliates with separate net incomes. We recognize that under respondent's regulations, these separate net operating loss carryovers are a part of the consolidated net operating loss carryover limited in use by the income of the affiliate using such separate carryovers. The theory of the regulations, as we have heretofore stated, appears to be that a loss generated by one business enterprise may not be used to offset income of another business enterprise. Absence this specific provision of the consolidated regulations to which the corporate petitioners agreed in order to be entitled to file consolidated returns, an inquiry might be required as to the similarity of the business enterprises of the various corporations in the consolidated group such as is involved in cases of mergers or other reorganizations. However, the regulation with respect to consolidated returns seems to require no such inquiry. In any event, it is not necessary in the instant case to consider the proper construction of respondent's regulations in this respect *91 since there is no evidence in the record to warrant a finding that the various affiliated corporations were engaged in substantially the "same business" for net operating loss carryover purposes. See A. R. Ruppert Plumbing & Heating Co., supra.
Under respondent's regulations it seems logical to conclude that each subsidiary which has both separate income and a separate net operating loss carryover can use the separate loss carryover to the extent that its separate income contributed to the overall amount of consolidated net income from which is subtracted the total of the losses of all the affiliates reporting separate losses. In other words, the $218,861.76 consolidated net income reported by Honolulu and subsidiaries would be prorated to each affiliate reporting a separate income on the basis of applying to that amount the percentage that the income reported by that affiliate bore *92 to the total of the separate incomes reported by all affiliates reporting separate incomes. If only those affiliates that had separate net operating loss carryovers also had separate net incomes, this would amount to prorating the consolidated net income among them. However, this is not the factual situation in this case. Some of the affiliates which had separate net incomes did not have separate net operating loss carryovers. However, it seems no more logical to indirectly increase the consolidated net operating loss carryovers by permitting the separate net operating loss carryovers of affiliates which have both such carryovers and separate incomes to be used to the full extent of the total consolidated net income of the group, thus freeing any consolidated net operating loss carryover from prior years which otherwise would be used to offset separate incomes of affiliates which reported separate incomes but had no separate net operating loss carryover, for use in subsequent years, than it is to directly increase the consolidated net operating loss carryover by permitting separate carryovers to be used by affiliates having separate incomes in years when there is a consolidated net *93 loss. We therefore hold that the amount of the consolidated net income, prior to application of any net operating loss carryover, is to be prorated among all affiliates reporting separate incomes whether or not such affiliate has a separate net operating loss carryover on the basis that the income reported by such affiliates bears to the total of the income reported by all affiliates reporting income. The amount of income so allocated to each affiliate which has a separate net operating loss carryover, will be the maximum extent to which such separate net operating loss carryover may be used in computing the taxable consolidated net income. In view of our holding that respondent correctly reallocated the income from the sales of certain houses from the Wherry corporations to Topeka, the issue with respect to the application of separate net operating loss carryovers will have substantially less effect on the consolidated tax liability for any of the years here in issue than would be the case had we not approved the respondent's reallocation of income to Topeka. However, since it appears that the method of applying the separate net operating loss carryovers will have some effect *94 on the amount of the consolidated tax liability in each year here in issue, we consider it necessary to decide the issue. Distributions by Ord and Highland Park in the Fiscal Year 1956 Issue 1(c) Petitioners take the position that distributions made by Ord and Highland Park to Honolulu in the fiscal year 1956 were dividends and therefore under the provisions of section 1.1502-31(b)(2)(ii)[12] were excludable in computing consolidated net income. In the alternative, petitioners contend that if the amounts were not dividends, they should be eliminated from consolidated income under the provisions of section 1.1502-31(b)(1)(i) which provides for the elimination from consolidated income of "unrealized profits and losses in transactions between members of the affiliated group and dividend distributions from one member of the group to another member of the group." Petitioners argue that since the distributions were with respect to stock, they were dividends and therefore the "cost basis" of Honolulu in the stock is not a consideration in determining whether the amounts are includable in Honolulu's income. *95 The first problem therefore is whether the distributions made by Ord and Highland Park to Honolulu in the fiscal year 1956 constituted dividends. Respondent's consolidated regulations, section 1.1502, nowhere define "dividends". However, these regulations in section 1.1502-2(f), provide that "Terms which are defined in the Code shall, when used in the regulations under section 1502 have the meaning assigned to them by the Code, unless specifically otherwise defined." Therefore, in determining whether a distribution from a subsidiary to a parent of an affiliated group filing a consolidated return is a dividend, it is necessary to turn to the definition of dividend contained in section 316 of the Internal Revenue Code. Section 316 provides that the term "dividend" means any distribution of property made by a corporation to its shareholders out of its accumulated or current year's earnings or profits. [13]
*96 As we have set forth in our findings, Ord and Highland Park each had a loss for the fiscal year ended June 30, 1956 and the separate balance sheet of each of these corporations included with the consolidated return filed showed that each had an "earned deficit," as of the end of June 30, 1955 and June 30, 1956. From these facts we conclude that neither Ord nor Highland Park had any accumulated earnings or profits as of June 30, 1955 or June 30, 1956. Therefore under the definition contained in section 316 any distribution which they made to their stockholder fails to meet the definition of dividend and may not be considered as the distribution of a dividend. It therefore becomes necessary to consider petitioners' alternative contention that the amounts of these distributions should be eliminated as "unrealized profits * * * in transactions between members of the affiliated group * * *." ( Sec. 1.1502-31(b)(1)(i), Income Tax Regs.) The distributions made by Ord and Highland Park to Honolulu were made to Honolulu as the owner of their stock and were "distributions with respect to stock." Respondent determined to this effect and there are no facts to *97 show to the contrary nor does petitioner contend to the contrary. Such facts as are in the record indicate that the distributions were with respect to stock. The provision for the elimination of "profits" in transactions between members of an affiliated group is to be read in its normal context, and so read must be considered as referring to the exchange by one affiliate of money or other property for property, goods of, or services rendered by another affiliate. We therefore conclude that the nature of the distributions by Ord and Highland Park must be characterized as a distribution with respect to stock under the general definition of the terms in the Code. ( Section 1.1502-2(f), Income Tax Regulations). Section 301(a) provides that the distribution of property, which is defined to include money as well as other property, made by a corporation to a shareholder with respect to stock shall be treated in the manner provided in section 301(c).[14] Section 301(c) provides that the portion of the distribution which is a dividend shall be as defined in section 316 and that the portion of the distribution which is not a dividend shall be applied against *98 and reduce the adjusted basis of the stock and that the portion of the distribution which is not a dividend, to the extent that it exceeds the adjusted basis of the stock, shall be treated as gain from the sale or exchange of property. Therefore, under the provisions of section 301(c)(3), the portion of the distribution by Ord and Highland Park to Honolulu in the fiscal year 1956 that exceeded the basis of Honolulu in the stock of Ord and Highland Park, shall be treated as gain from the sale or exchange of property. This conclusion is in accordance with our holding in American Water Works Co., 25 T.C. 903 (1956), affirmed on this issue and reversed on another issue 243 F. 2d 550 (C.A. 2, 1957). In that case we held that the basis of the stock of an affiliate should be reduced by distributions made by that affiliate not out of earnings and profits during the years when consolidated returns were filed. In so holding we relied on a provision of respondent's regulations that the basis of stock of the issuing corporation held by each member of the affiliated group other than the issuing corporation should be separately determined for each member of the group and *99 adjusted in accordance with "the Code" in order to determine gain or loss on the sale of such stock. In American Water Works Co., supra, we stated, at page 912, the following: The petitioner argues that there should be no reduction in the basis of its stock in Texarkana due to the capital distributions made to it by Texarkana in years when consolidated income tax returns were filed by the two corporations. No support for the petitioner's argument can be found in section 23.31(d)(2) of Regulations 104. This section states that capital gains and losses on a consolidated return shall be determined without regard to "gains or losses arising in intercompany transactions." Such a transaction is not before us. We have in this case a sale of stock by the petitioner to a party outside the affiliated group, and any gain arising from such sale cannot be regarded as arising in an intercompany transaction. * * * *100 In the instant case we are concerned with the provisions of section 1.1502-31(b)(2)(iii)(a) of respondent's regulations providing that capital gains on transactions between members of an affiliated group shall be eliminated in determining consolidated taxable income. [15]
*101 Since, as we have stated, the distributions by Ord and Highland Park to Honolulu are to be treated under section 301(c) as "gain from the sale or exchange of property," the gain would be a capital gain. Since the distribution was by the subsidiary to its parent, the gain arises in an "intercompany transaction." Therefore, the specific language of respondent's regulations provides that in the computation of the incomes of the various members of the affiliated group, of which, of course, Honolulu is one here, to be used in determining the consolidated net income or loss, the determination shall be made without regard to the gain arising in this transaction. The transaction is not within either of the exceptions contained in respondent's regulations. Respondent, in his brief, makes no argument as such against the application of section 1.1502-31(b)(2)(iii)(a) but merely cites and relies on Revenue Ruling 57-201, 1957-1 C.B. 295. In this ruling respondent states as his position that the gain accruing to a parent corporation from cancellation of its indebtedness to a subsidiary is recognized in computing consolidated income to the extent that the advances from the subsidiary *102 exceed the basis of the subsidiary's stock in the hands of the parent. Under the provisions of section 301(c), such excess is taxable in the same manner as gain from the sale or exchange of property and constitutes capital gain. In justification for ignoring the provisions of section 1.1502-31(b)(2)(iii)(a) of his regulations, respondent states as follows in his ruling: The general design of the consolidated return regulations permits transfers of property between members of an affiliated group which files a consolidated return to be made without present tax consequences if no ultimate tax advantage is gained thereby. Thus, section 1.1502-31(b)(2)(iii)(a) of the Income Tax Regulations provides, in effect, that capital gains on sales or exchanges between members of an affiliated group shall be eliminated in determining consolidated taxable income. The possibility that this rule could lead to tax avoidance is obviated by section 1.1502-38(b) of the Income Tax Regulations which provides that the basis of property in the hands of one member of an affiliated group shall remain the same when it is transferred to another member *103 of the group. Thus, the gain remains potentially taxable after the transfer of property and is recognized if the property is then sold outside of the affiliated group. However, this safeguard would not be present if the gain which results from the distribution in the instant case were eliminated in computing consolidated taxable income. Since no property other than cash is transferred, there is, of course, no carry-over of basis; and, although the distribution reduces the basis of the subsidiary's stock in the hands of the parent to zero, there is no adjustment to reflect the amount of distribution in excess of the basis of such stock. If the parent sold the stock at a later date, any gain then recognized for income tax purposes would be less than the actual gain on its investment in the subsidiary. Thus, if gain were not recognized upon the distribution, the excess of the distribution over P's basis of the stock would completely escape taxation, contrary to the express purpose of Congress and the design of the regulations. Compare section 1.1502-37(a)(1)(ii) of the Regulations which provides for the inclusion of gain on the receipt of certain cash distributions from a member of *104 an affiliated group in cancellation or redemption of its stock. * * * The substance of respondent's statement in this ruling is that something specifically provided to the contrary in his regulations shall be used in the computation of consolidated income since otherwise there is a possibility of certain income escaping tax. Under similar circumstances, we specifically refused to follow a ruling by respondent in Henry C. Beck Builders, Inc., 41 T.C. 616, 628 (1964). In so doing we stated: Respondent has broad power to amend his regulations. He must have known of this "loophole" before the deficiency notice was sent in this case. Revenue Ruling 60-245, 1960-2 C.B. 267, involving an almost identical set of facts, appeared 2 months before the date of the notice. Respondent there cited no provision of the Code or regulations to support his view that the parent should be taxed on the previously eliminated profit when the parent disposed of the subsidiary's stock. [footnote omitted] Respondent's reluctance to use his conceded power in this area to set forth rules of general application * * * does not justify in this case a judicial improvisation to prevent *105 a reduction of the revenue that is problematic in both nature and amount. [footnote omitted] The same statement is equally applicable to the situation here involved. It is problematical whether the amount distributed to Honolulu by Ord and Highland Park has not in effect been a part of the consolidated income which has been subject to tax. Here it would appear that the situation is as in respondent's revenue ruling 57-201, supra, that the "corporation receives rental income from property that it owns, but, principally due to the deduction for depreciation, it has no taxable income or earnings and profits for tax purposes." However, except for the income from which the depreciation was deducted, Ord and Highland Park would be unlikely to have available an amount to distribute in cash to Honolulu. Had the corporations not had and reported this income, their losses would undoubtedly have been greater and the reduction in tax which might have resulted from such increased losses is quite "problematic." Expressed another way, to the extent that the cash which was distributed to the parent was accumulated by the subsidiaries during consolidated years, it very likely has in some way *106 been taxed as an overall part of the consolidation. The fact that respondent in connection with redemption of stock issued a specific regulation which we will subsequently discuss, does not justify reaching a conclusion specifically contrary to another portion of his regulations where he has not chosen to change those regulations. In affirming in part our decision in American Water Works Co., supra, the Circuit Court stated with regard to the provision of the regulations there under consideration comparable to section 1.1502-31(b)(2)(iii)(a) of the present regulations (243 F. 2d 550, 554): * * * Thus taxpayer fails to distinguish between (1) the treatment of capital distributions from the issuing corporation to the stockholder corporation for the purpose of computing their consolidated net income in the year of the intercompany distribution, and (2) the treatment of these same capital distributions for the purpose of determining the basis of the stock of the issuing corporation in the hands of the stockholder corporation when that stock is subsequently sold to an outsider. Even though the Circuit Court proceeded to discuss the fact that Congress did *107 not intend such a "windfall" as would result to the taxpayer there involved if the basis of the stock were not reduced by prior distribution, there is nothing to indicate that the Court intended to hold that respondent's regulations specifically providing for elimination of capital gain from transactions between members of the affiliated group should not control in a situation such as we have in the instant case. The Court in its opinion referred to the Treasury regulations in connection with consolidated returns as having "in effect, the force of law." We therefore hold that the distributions made by Ord and Highland Park in 1956 are properly used to reduce petitioners' bases in the Ord and Highland Park stock, but to the extent that the distributions exceed Honolulu's basis in the stock they are to be treated as capital gains in transactions between members of the consolidated group and the computation of the consolidated net income or loss for the year 1956, for the purpose of determining the net operating loss carryover to the fiscal year ended June 30, 1957, is to be made by determining Honolulu's income without regard to this capital gain. Gain on the Redemption of the Ord *108 and Monterey Stock Issue 2 After obtaining permission from the FHA in accordance with a requirement applicable to Wherry corporations, Ord and Monterey, in the fiscal year ended June 30, 1957, redeemed all of their class A stock held by Honolulu. Respondent determined that Honolulu received long-term capital gain on this redemption which should be included as such in computing consolidated taxable income of Honolulu and its subsidiaries. It is respondent's position that this determination is strictly in accordance with the provisions of section 1.1502-37(a)(1)(i) and (ii), Income Tax Regs., [16] which provides an exception to the nonrecognition of gain or loss upon a distribution during a consolidated return period by one member of an affiliated group to another member where the distribution is in cancellation or redemption of all or a portion of the stock of the affiliate making the distribution. The exception to which respondent refers is where a distribution is one made in cash in an amount in excess of the adjusted basis of the stock. *109 Petitioners argue that this regulation applies only to distributions in liquidation which the instant distribution in redemption of the class A stock was not. We do not agree with petitioners' interpretation of the regulation since we think the clear import of this regulation is that section 1.1502-37(a)(1)(i) is applicable in case of a complete liquidation and redemption of all stock where the corporation terminates its business, and section 1.1502-37(a)(1)(ii) provides for a situation where there is a redemption of all or a portion of the stock without such a liquidation and termination of business being required. Technically, since the two are in separate paragraphs and precede a third paragraph, (iii), which follows the word "or" this is the logical interpretation. Also, we interpreted this provision in Henry C. Beck Builders, Inc., supra, at page 631, to apply to a redemption not in complete liquidation. Petitioners' reliance on section 1.1502-33 [17] is misplaced since that section specifically provides for the taxability of gain or loss on disposition of stock in intercompany transactions except where the disposition is by sale or in complete or partial liquidation *110 not involving cash in excess of the adjusted basis of the stock. In the instant case *111 the disposition of Ord and Monterey stock was by redemption of the class A stock and not by sale or by complete liquidation and there was cash in excess of basis involved. We therefore sustain respondent in his determination that to the extent the amounts paid by Ord and Monterey to Honolulu in redemption of their class A stock exceeded Honolulu's basis in that stock, Honolulu realized capital gain includable in consolidated net income. Petitioners next argue that the redemption price was less than Honolulu's basis in the stock. The answer to this contention is governed by whether respondent properly reduced the basis of the Ord stock to zero because of the distribution to Honolulu in 1956 and the basis of the Monterey stock by the $36,000 distribution Monterey made to Honolulu in 1956. The issue here is precisely the same as that involved in American Water Works Co., supra, and on the basis of that case we hold that respondent did properly reduce the basis of the Ord and Monterey stock because of the 1956 distributions. As we pointed out previously, these corporations had no earnings or profits for the current year or accumulated earnings or profits so the distributions *112 were not out of earnings or profits, and therefore reduced the basis of the stock. By amendment to answer, respondent alleged that the remaining basis of the Monterey stock should be reduced to reflect losses which could not have been used by Monterey if Monterey had filed separate returns during the years of consolidation. Sections 1.1502-33 and 1.1502-37 both require that the basis for determining gain or loss on the disposition of stock of an affiliated member of a consolidated group which makes or is required to make a consolidated return shall be adjusted in accordance with section 1.1502-34 of respondent's regulations. This section of the regulations carries a specific provision that the basis of the stock is to be reduced by the sum of "all losses of such issuing corporation sustained during taxable years for which consolidated income tax returns were made * * * to the extent that such losses could not have been availed of by such corporation as net loss or net operating loss in computing its net income or taxable income * * * for such taxable year if it had made a separate return for each of such years." Sec. 1.1502-34(b)(2)(i), Income Tax Regs.
*113 Respondent therefore is correct that the basis of the stock is to be reduced by losses of Monterey availed of in the computation of consolidated net income which could not have been availed of had Monterey filed a separate return. Petitioners on brief do not argue the point with respect to the further reduction of the Monterey stock, and respondent's computation of the $95,330.54 loss which was availed of which could not have been used had Monterey filed a separate return appears to be a minimum required reduction under the regulations. [18] Respondent made the computation on the assumption that under the provisions of section 1.1502-34(b)(2), a reduction was required of the loss of Monterey for the fiscal years ended June 30, 1954 and 1955, because the consolidated group sustained a consolidated loss "not availed of in prior or subsequent years as a deduction under net loss or net operating loss provisions." *114 This may or may not be the situation after recomputation in accordance with our decision in this case since the results of a recomputation under our decision on all the issues may be that all consolidated losses for the fiscal years ended June 30, 1954 and June 30, 1955, would be availed of by a consolidated group in a subsequent year. However, the computation as made by respondent reduces the amount of the loss of Monterey which could not have been availed of had Monterey filed a separate return. If this adjustment were not made, the result would be a greater and not a lesser reduction of the basis of Monterey stock. Therefore, since respondent made the contention by an affirmative allegation in an amendment to answer, the total amount of reduction applicable to all classes of Monterey stock is the $95,330.54 which he has claimed and alleged even though as a result of the recomputation in this case a higher amount might otherwise appear to be a proper amount. This brings us to the next question of whether respondent has properly distributed the reduction between the class A stock of Monterey redeemed and the class B stock which was not redeemed. Section 1.1502-34(b)(4), Income Tax Regs. *115 , provides for this distribution. Respondent in making the computation, assigned a basis of $200,000 to the class A stock redeemed and $15,000 to the class B stock not redeemed. However, the stipulated facts are that the basis of Honolulu in the class A stock of Monterey was $215,000 and the only evidence in the record as to the basis of the class B stock is the statement on the balance sheet of Monterey showing as a liability class B capital stock in the amount of $15,000. Since this is an affirmative allegation on the part of respondent, he must prove all the necessary facts to make the determination. It may be that the class B stock did not have a basis of $15,000 in addition to the $215,000 basis stipulated to be that of the class A stock, but respondent has failed to show that this is a fact and therefore we hold that in prorating the reduction in basis to the various classes of stock the value of the class A stock to be used is $215,000 and the value of the class B stock is $15,000. Our holding with respect to the requirement for a reduction in the basis of the stock redeemed for losses of Monterey during the consolidated period which that corporation could not have availed *116 itself of if it had filed a separate return is in accordance with our holding on a similar issue in Henry C. Beck Builders, Inc., supra.
Deduction of Legal and Appraisal Fees Issue 3 The first of the items which respondent disallowed as a deduction was the amount of $2,700 paid by Ord and Monterey for legal services to secure permission to redeem their stock held by Honolulu. This amount was paid during the fiscal year ended June 30, 1957. There is no question that it was not a necessary payment since the FHA required obtaining permission to redeem the stock. The facts show that the redeemed stock was cancelled. The redemption involved all of the class A stock of Ord and Monterey and none of the class B stock. Petitioners make no argument as to the legal nature of the expenditure in connection with the redemption of the stock. Respondent, in his brief, argues that the expenditure should be added to the cost of "Treasury stock acquired by the corporation." However, the facts show that the redeemed stock was cancelled and therefore there is no "treasury stock" acquired by the corporation to add this expense to as a basis. We agree with respondent that the item *117 is of the nature of selling expenses in connection with the sale of stock. Ordinarily, this would be considered as increasing the amount paid for the stock and would become a part of the cost and basis of an asset acquired. In the instant case, Ord and Monterey redeemed their stock and so had no asset, the basis of which could be increased. Under these circumstances the amount is in the nature of an amount expended in an effort to acquire a capital asset which results in a failure to acquire the asset. On this analogy we conclude that petitioners are entitled to deduct the $2,700 payment. The next item involved in respondent's disallowance of legal and appraisal fees is an amount of $17,500 which is a portion of the $20,000 paid in 1958 to the attorney who generally handled the legal affairs of the Foster corporations and partnership. The services were rendered during the fiscal year ended June 30, 1956, and all the evidence shows with respect to these services is that the law firm to which the fee was paid had been counsel to the Foster organization since 1950 and that the fee did not relate to services performed with respect to the condemnations of the properties of the Wherry *118 corporations. The bill for the fee showed that it was for services rendered to all Foster companies during the year 1956. The only problem here is whether there is any justification for allocating the sum of $17,500 to Honolulu and its subsidiaries leaving only $2,500 as applicable to the partnership or any other work that might have been done for Foster which was not in connection with Honolulu and its subsidiaries. The only evidence with respect to this allocation is the testimony of Foster that an effort to properly allocate items was made. He could not remember precisely what the fee was for, nor how the amount was allocated. A difficult problem is posed here since the burden of proof rests on petitioners to show that the $17,500 was a proper deduction for Honolulu and its subsidiaries. Although the proof is meager, we are satisfied that the entire $20,000 was a proper business expense deduction and that to the extent of the $17,500 it has not been taken as a deduction by any of the other Foster interests. We also give some weight to the fact that there does not appear to be any particular tax benefit in the method used to allocate the fee and for this reason it is unlikely that *119 the allocation was made otherwise than in accordance with the best judgment of the employees of the Foster interests charged with the responsibility of the company's books as to the portion of the legal services rendered to the various Foster interests. We therefore hold that Honolulu and its subsidiaries are entitled to the deduction of the $17,500 as a business expense. Respondent argues that since the legal fees were for services rendered in the fiscal year 1956, the amount of such fee should have been accrued by Honolulu and subsidiaries in that year and deducted in computing the income for that year and not deducted in the fiscal year ended June 30, 1958, when the amount was paid. The evidence here shows that there was no agreement between Honolulu and its subsidiaries and the attorneys as to the amount of the legal fee and that the amount of the fee for the services was not reasonably ascertainable by Foster or any of the Foster employees or by Honolulu or its subsidiaries until the receipt of the bill. Therefore, even if we assume that the corporate petitioners were on an accrual basis of accounting, the legal fees were not accruable prior to 1958 when the bill for services *120 was received. Lanova Corporation, 17 T.C. 1178, 1186 (1952). We therefore agree with petitioners that the $17,500 was properly deductible in the fiscal year ended June 30, 1958. The remaining items in issue, if petitioners are still contesting these adjustments, are $500 of an amount paid for a legal opinion with respect to procedure in the condemnation proceedings and a $5,000 legal fee and $9,000 appraisal fee paid with respect to these condemnation proceedings. It is not clear whether petitioners now concede that these adjustments are proper. In any event, the evidence shows that these items were expenses in connection with the disposition of the properties of the Wherry corporations in the general nature of selling expenses. Respondent has allowed these items as expenses in computing the gain in connection with the condemnation. Respondent's adjustment in this respect is correct, and we sustain respondent in his disallowance of these amounts as deductions for business expenses and hold he was correct in considering the amounts to be a reduction of the amount received on the disposition by condemnation of the properties of the Wherry corporations. Deductibility *121 of Expenses in Connection with Acquisition of Property
Issue 4 Respondent disallowed a total amount of $120,811.04 claimed as a deduction by Lomita for the fiscal year ended June 30, 1957, and treated the amount as a part of the basis in the properties acquired by Lomita which it subsequently sold. Two of the items involved in the total of $120,811.04 disallowed by respondent are $66,257.30 and $14,687.32 of bank charges in the nature of interest expense which had been incurred by California Development Company before the San Jose property which was being developed by that company was transferred to Lomita. It is well settled that expenses of a preceding owner of property paid by the person acquiring such property, irrespective of what would be the nature of the expenses to the prior owner, are a part of the cost of acquiring the property by the person so acquiring the property and become a part of the basis or purchase price of the assets acquired. Such payments are capital expenditures and not current expenses or losses to the individual who acquires the property. Holdcroft Transp. Co. v. Commissioner, 153 F. 2d 323 (C.A. 8, 1946), affirming a Memorandum Opinion *122 of this Court. One of the remaining items composing the $120,811.04 was an amount of $1,650.62 which represented costs to Lomita of engineering fees for plans for the development. This item is one of a capital nature and petitioners make no real argument to the contrary. The final item composing the amount disallowed as a deduction and capitalized by respondent is an amount of $38,215.80. The precise nature of this amount is not clear. The stipulation states with respect to this item, "Subsequent to the date of default, Lomita expended for FHA and FNMA commitments the sum of $38.215.80 * * *." If the amount had been paid by Lomita for its own commitments it would appear that it would be of the same nature as the engineering fees and a capital expenditure. However, the testimony shows that the $38,215.80 was a commitment fee with respect to the loan to Colifornia Development Company and that this amount of the commitment fee was applicable to loans which had not been drawn down. The $38,215.80 was apparently a part of the loan assumed by Lomita. If this item was an expense of the previous owner of the property which was assumed and paid by the person to whom the property was transferred, *123 it, like the interest expenses, is properly to be capitalized. Holdcroft Transp. Co. v. Commissioner, supra. The state of evidence in this case does not justify a conclusion that the $38,215.80 was something other than part of the cost of the property to Lomita. The burden of proof with respect to the deduction of the expenses rests on petitioners and petitioners have failed to show that this item is one that is properly deductible. We therefore sustain respondent's determination that the entire $120,811.04 is not deductible as business expense but is an additional cost of the San Jose property acquired by Lomita. Claimed Deductions for Travel and Entertainment Expense Issue 5 The various travel and entertainment expenses disallowed by respondent to Honolulu and subsidiaries in the computation of consolidated income fall basically into two categories. The first is composed of $4,100 of deductions claimed by the Wherry corporations. Of this amount respondent considered $1,500 to be expenses in connection with the condemnation of the property of Wherry corporations and increased the sales expense of those projects by that amount in determining the gain on the *124 condemnation of the property. The testimony shows that the Wherry corporations incurred some expenses in connection with repairing certain fixtures in the various houses in the projects and in inventorying certain personal property belonging to the corporations and inspecting the units to determine their condition prior to their condemnation. Since the personal property as well as the leasehold was condemned, the expenses in connection with repairing fixtures to increase their value at the time of condemnation are properly to be considered as a reduction in the price received for the property when sold. The other items for which the expenditures were made are likewise in the nature of selling expenses of the properties. Expenses connected with a condemnation of property are, as those connected with a sale of property by other methods, capital expenditures, which are deductible from the amount received for the property in computing the gain on its sale. William Justin Petit, 8 T.C. 228, 236-237 (1947). Petitioners have the burden of proving that the expenses incurred by the Wherry corporations in preparing the properties for condemnation were greater than the $1,500 *125 allowed by respondent. This burden petitioners have not sustained. Foster testified with respect to going to the project and carrying cash and paying for certain items in cash but he did not testify as to the amounts so expended. The evidence is wholly insufficient to justify a conclusion that the amount of the expenditure was greater than the amount allowed by respondent. The remaining controversy involves an amount of $4,344 claimed as a deduction by Honolulu, the nature of which is unexplained in the evidence and an amount of $10,000 claimed as a deduction by Honolulu which represented an allocable portion of an amount of $20,301.50 of travel and entertainment expenses paid by the Foster partnership. The evidence does not show the nature of the travel and entertainment expenses paid by Foster & Sons which comprise the $20,301.50. We might attempt to determine whether any portion of the amounts paid as travel and entertainment expenses by Foster & Sons was properly chargeable to Honolulu if we knew the nature of these expenses. There is no evidence in the record as to the nature of the expenses. We are not warranted in considering that any portion of the $10,000 deduction claimed *126 by Honolulu for such expenses was proper without any information as to the items that comprise the total expenses of which $10,000 was allocated to Honolulu. It is possible that of the total of $20,301.50 an amount of $10,000 was not such entertainment expenses as to constitute an ordinary and necessary business expense deduction for any of the Foster organizations. Since the burden of proof with respect to deductions claimed is on petitioners, we sustain respondent in his disallowance of the claimed deductions for travel and entertainment expense in the amount of the $4,344 for the fiscal year 1958 and $10,000 for the fiscal year 1959. Gain with Respect to the Condemnation of the Property of the Wherry Corporations Issue 6 That there was ultimately a gain from the condemnation of the properties owned by the Wherry corporations is clear from the facts and petitioners do not argue to the contrary. However, the time that such gain arose has a substantial effect on the tax liabilities of the various corporate petitioners because of the plan of liquidation adopted by the four Wherry corporations in August 1958 and the completion in August 1959 of that liquidation within a year after *127 the plan was adopted. It is also necessary to determine whether any gain was realized prior to February 10, 1958. On that date the Wherry corporations ceased to be affiliates of Honolulu and therefore income received prior to February 10, 1958, is a part of the consolidated income for Honolulu and subsidiaries for the fiscal year ended June 30, 1958, while income received by the Wherry corporations after February 10, 1958, is taxable to them as separate corporations, and the resultant tax is a part of the liability of their stockholders as transferees to the extent of the value of the assets transferred to the stockholders. The facts which we have set forth show that each of the Wherry corporations had a principal balance due on its mortgage in excess of its adjusted basis in the properties condemned at the dates in 1957 when the United States filed the condemnation proceedings and notices of taking. If the filing of these suits in which each of the Wherry corporations shortly thereafter filed a notice of appearance in which no objection was made to the taking of the property, but only a demand for a jury trial as to just compensation, constituted a sale or other disposition of the *128 properties whereby the Wherry corporations were relieved of their mortgage indebtedness, respondent is correct in his determination that each of the Wherry corporations received gain on the disposition of a capital asset to a person outside the affiliated group prior to February 10, 1958, and the capital gain so received is a part of the consolidated net income of the group for the fiscal year ended June 30, 1958. Where property is sold subject to a mortgage liability the amount received by the seller includes the amount of the mortgage to which the property was subject, even though the mortgage is not assumed by the purchaser. Crane v. Commissioner, 331 U.S. 1 (1947). In accordance with this principle, had the properties been sold by the Wherry corporations to the United States, those corporations would have realized income to the extent that the mortgages to which the properties were subjected exceeded their bases in the properties even though the amount which they would obtain in excess of such mortgages could not be considered as sufficiently ascertained to determine the entire gain ultimately to be received. If the properties had been sold subject to the mortgages *129 for only $1, the entire bases of the Wherry corporations in the properties would have been returned to them and the excess of the mortgage indebtednesses subject to which the properties were sold, would result in income to them, since in each instance "the 'amount realized' on the sale" included the amounts outstanding on the mortgages. Crane v. Commissioner, supra. Petitioners, however, argue that the condemnation proceedings under which the properties of the Wherry corporations were taken are more comparable to an involuntary conversion. Petitioners state that the liabilities of the Wherry corporations on the mortgages were unaffected by the transfer and all that the Wherry corporations received was a right to an award against which the mortgages might ultimately be offset. When the facts which we have set forth are considered in connection with the statutes under which the condemnations were made, petitioners' analysis is not supported by the evidence. Section 1594a(c)(2) of Title 42 of the United States Code which is a portion of the governing statute which authorized the acquisition by the United States of housing financed under the Wherry Act, provides that *130 in order to have possession of the houses surrendered under a declaration of taking, the minimum deposit necessary to be made shall be an amount equal to the actual cost of the housing as certified by the sponsor or owner of the project to the FHA, reduced by the amount of the principal obligation of the mortgage on the project remaining outstanding. [19] Therefore, in order for the United States to obtain possession of the properties, which the facts show it did in 1957, it was necessary for the United States to guarantee that the amount to be paid for the project would be at least in the principal amount of the FHA mortgages outstanding. *131 Any reasonable interpretation of this statute and of the pleadings in the condemnation case and the judgment of the District Court that title to properties was in the United States is that petitioners were relieved of their mortgages upon the transfer of title to the properties to the United States "subject to the interest of" the mortgagees. All of these events occurred before the end of the calendar year 1957. [20]
Therefore, unless it is to be considered that in a condemnation, as distinguished from a sale, the amount of the mortgage is not a part of the "amount realized," then the Wherry *132 corporations realized gain because of the excess of the mortgage liabilities on the properties transferred to the United States over their bases in the properties while they were affiliated and filing a consolidated return with Honolulu. In Hawaiian Gas Products v. Commissioner, 126 F. 2d 4 (C.A. 9, 1942), affirming 43 B.T.A. 655 (1941), it was held that condemnation proceedings amounted to a sale for the purpose of the provisions relating to gains and losses on the sale of a capital asset and that the sale occurred at the time of the transfer of the property. The transfer of the property is when it passes at the time of taking determined under the law under which the condemnation occurs. Kieselbach v. Commissioner, 317 U.S. 399 (1943). Under the law under which this condemnation proceeding was instituted the taking occurred upon the filing of the declaration and the deposit of some amount in excess of the mortgage liability on the property. Since we sustain respondent in his determination that the Wherry corporations realized capital gain during the year 1957 when their properties were taken by the United States, it is unnecessary to decide *133 the date of the execution of the so-called three-party agreements with respect to the various mortgages. It follows from our determination that the gain was realized in the calendar year 1957, that this same gain was not realized by Ord and Monterey after February 11, 1958, even though certain of the signatures to the three-party agreements did not occur until after this date. It is not clear on what facts petitioners base their contention that the bases of the properties on the books of the Wherry corporations are not their bases for the purposes of a computation of gain on condemnation. Apparently, from the testimony of petitioners' accounting witness that the book figures correctly reflect the bases of the corporations in the properties except for "prepaid items," it is petitioners' position that the bases of the properties should be increased by the amount at the date of condemnation of the deposit in escrow by each of the Wherry corporations with the mortgagee. The burden is on petitioners to show error in respondent's determination and petitioners have totally failed to show that the amounts deposited in escrow were not returned to them by the mortgagees after the condemnation *134 of the property. If petitioners' argument about bases is on any other ground, petitioners have not so stated. The loan agreements under which the projects were financed are not in evidence and nothing is in evidence to show what disposition was made of the escrow deposits with the mortgagees after title to the properties passed to the United States. We therefore cannot assume that the sums were not returned to the Wherry corporations prior to February 10, 1958. The three-party agreements indicate that these funds are to be repaid to the mortgagor. Petitioners object to these agreements on the ground that the Wherry corporations were not a party to them. However, we need not consider the indication from these agreements since petitioners have not proved that the escrow deposits were not in fact returned to them. The next issue with respect to the gain on the condemnation is whether the four Wherry corporations realized a taxable gain during their fiscal year ended June 30, 1959, because of the withdrawal during August and September of 1958 of amounts which had been deposited with the Court by the United States at the time of the filing of the declarations of taking and an amended *135 declaration of taking. Petitioners apparently recognize that respondent is correct in his contention that these withdrawals constituted receipts with respect to the sale of the properties which would result in gain if they were in excess of basis. Petitioners' argument with respect to these withdrawals is first that since the properties were still subject to mortgages on which the Wherry corporations were liable, the withdrawals in August and September of 1958 were less than the bases of the Wherry corporations in the properties and therefore no gain was realized. Since we have held that upon the taking of the properties by the United States in 1957, the Wherry corporations realized gain to the extent that the principal liabilities on the mortgages exceeded their bases in the properties, it follows that the Wherry corporations each recovered its entire basis in the properties in 1957 and that the entire amount of the withdrawals in 1958 represented gain. Petitioners' next argument is that if gain was realized on the withdrawal of the deposits, it is not to be recognized for tax purposes under the provisions of section 337. [21] This section provides that if a corporation adopts a *136 plan of complete liquidation on or after June 22, 1954, and within the 12-month period beginning with the date of the adoption of the plan, all of the assets of the corporation are distributed in complete liquidation, no gain or loss shall be recognized to that corporation from the sale or exchange by it of property within such 12-month period. The facts show that the Wherry corporations adopted a plan of complete liquidation on August 11, 1958, and distributed all of their assets and completed their liquidation on August 8, 1959, within a 12-month period. Therefore, the only provision of section 337 which respondent contends the Wherry corporations do not come within is the requirement that their properties be sold within the 12-month period after the adoption of the plan of liquidation. *137 This question has arisen in a number of cases. Our Court as well as other courts, has held that in determining the date of sale for the purpose of section 337 where a condemnation has taken place, the sale occurs when title passes in accordance with the law governing the condemnation proceeding, and if title passes on the date of the commencement of the condemnation suit, a corporation does not come within the nonrecognition-of-gain provisions under section 337 with respect to the sale if it adopts a plan of complete liquidation after the commencement of suit and passing of title. 44 West 3rd Street Corporation, 39 T.C. 809 (1963), affirmed sub nom. Wendell v. Commissioner, 326 F. 2d 600 (C.A. 2, 1964); Dwight v. United States, 328 F. 2d 973 (C.A. 2, 1964); and Harriet Fibel, 44 T.C. 647 (1965). These cases all involved condemnations under New York Law and concluded under that law that title vested and the sale occurred for the purposes of section 337(a) on the date the order of condemnation was entered. The condemnation in the instant case is under 40 U.S.C., section 258a[22] which provides that a declaration *138 of taking may be filed by the United States, and that upon the filing of such a declaration of taking, and the making of a deposit in Court to the use of the persons entitled thereto, "title to the said lands in fee simple absolute, or such less estate or interest therein as is specified in said declaration, shall vest in the United States of America, and said lands shall be deemed to be condemned and taken for the use of the United States, and the right to just compensation for the same shall vest in the persons entitled thereto; * * *." This section clearly provides for the passing of title to the United States upon the filing of the declaration of taking and the deposit of moneys in the Court which, as we have stated heretofore, were deposited in accordance with the provisions of 40 U.S.C. 258 and 42 U.S.C. 1594a. Since the sale of the property occurred prior to the adoption on August 11, 1958, of *139 a plan of complete liquidation by the Wherry corporations, the provisions of section 337(a) are not applicable with respect to Wherry corporations' properties condemned by the United States, and therefore these corporations did realize gain upon the withdrawal of the funds deposited by the United States in the District Court in which the condemnation proceedings were pending. 44 West 3rd Street Corporation, supra, and Harriet Fibel, supra. We therefore sustain respondent in his determination that the Wherry corporations each received a gain from the sale of the properties during their fiscal year ended June 30, 1959, because of the withdrawal of funds in August and September 1958 from the deposits in the District Courts. Claimed Deductions for Administrative Expenses Issue 7 Respondent disallowed a net amount of $325,000 of deductions claimed by Honolulu and subsidiaries as administrative expenses, finance fees, and interest expenses on the ground that they did not represent ordinary and necessary business expenses or an allowable deduction. The facts show that Foster personally negotiated for financing fees for two housing projects to be built by *140 Honolulu in Honolulu, Hawaii. These projects were known as Harbor Heights and Foster Village. The evidence also shows that the financing which was arranged and obtained to enable Honolulu to proceed with these two projects was in such an amount that a $80,000 fee for services in arranging the financing was a reasonable amount in an arm's-length transaction between unrelated parties. Two of the sums, one in the amount of $50,000 and one in the amount of $30,000, were paid by Honolulu to Foster for his services as an officer of the corporation arranging for the availability of financing for the property and are deductible by Honolulu as ordinary and necessary business expenses unless they should be considered as a part of the cost of the projects. Although the evidence is not completely clear it shows to our satisfaction that the services were in connection with the general financial problems of Honolulu and therefore a business expense and not a capital expenditure. A portion of the remaining $245,000 of deductions was payments to Foster as salary. It is not completely clear from the record as to the payments that were for salary but we are satisfied that the two items of administrative *141 expense, one charged to Foster Development and one charged to Foster Homes totaling $180,000, represent a payment of salary of $105,000 to Foster and a $75,000 payment to the partnership, Foster & Sons. The payment of $105,000 to Foster was charged to Foster Development and deducted by it. This was the company that developed Foster Village for Honolulu, a project consisting of 525 houses. Because of the size of this project and the necessity for obtaining interim financing for its construction as well as permanent financing, we consider the record to be sufficient to show that the $105,000 was a reasonable salary payment to Foster and that this amount is deductible by Foster Development as an ordinary and necessary business expense. We therefore sustain petitioners' position that deductions to the extent of $185,000 of the claimed $325,000 disallowed by respondent are properly allowable. There is nothing in the record to show the basis of the payment of the $75,000 to Foster & Sons or what was included in the $142,351.07 for other corporate expenses. These amounts may have been capital expenditures or for other reasons not deductible expenses. We therefore sustain respondent in the *142 disallowance of these deductions because of petitioners' failure to show error in that disallowance. The other item involved is an interest expense deduction by Foster Homes of $22,648.02. The evidence shows that Foster personally advanced some funds in connection with the development of Harbor Heights and Foster Village. The evidence further shows that $250,000 of the $325,000 of disallowed expense deductions represented amounts paid to Foster and $75,000 represented amounts paid to the partnership, Foster & Sons. It therefore appears that the $22,648.93 was paid to Foster and reported by him as income on his personal income tax return as were the amounts of the other payments to him by the various corporations. Certainly Foster is entitled to receive interest from the corporations on personal funds advanced. Although the proof is not as clear as it might be, we conclude that the interest expense was paid to Foster in connection with advancements of funds and that the funds were advanced in connection with the business activities of Foster Homes in the construction of houses in Foster Village and therefore the $22,648.02 interest payment is a proper deduction by Foster Homes in *143 the computation of its taxable income. Whether Honolulu Had a Gain from Distributions in Liquidation by the Wherry Corporations Issue 8 Respondent takes the position that since amounts of $463,226 and $318,827 were withdrawn from the District Court by Ord and Monterey, respectively, and the amounts of $171,500 and $166,500 were withdrawn from the District Court by Biggs and El Paso, respectively, pursuant to the orders of those courts permitting the withdrawal by those corporations, the amounts became the property of the Wherry corporations and were distributed by those corporations to Honolulu and the other stockholders of the Wherry corporations as a liquidating dividend. The facts show that all of the amounts withdrawn totaling $1,120,053 were placed in Honolulu's bank account. The fact alone would not necessarily show that the amounts were distributed to the stockholders of the Wherry corporations, since it apparently was not uncommon for funds of one of the related group of corporations to be placed in the bank account of another related corporation. However, the entry of September 5, 1958, on Honolulu's books of a credit of $888,576.13 to "Gain on Sale of Assets" and *144 the making of appropriate credit on Honolulu's books to Foster and his sons, the other stockholders in the Wherry corporations, indicate that a distribution of the amount of $888,576.13 was made by the Wherry corporations to Honolulu in the fiscal year ended June 30, 1959. Shortly prior to the entry of the $888,576.13 on the books of Honolulu as a "Gain on Sale of Assets," the Wherry corporations had adopted plans of liquidation. Therefore the distributions were distributions on liquidation. The record shows that all of the assets of each of the Wherry corporations were distributed to its shareholders before August 8, 1959, when the liquidations were completed. Petitioners apparently are not contending that the distributions of $888,576.13 were not made to Honolulu by the Wherry corporations during the year ended June 30, 1959, but apparently are contending that the bases of the assets of the Wherry corporations with respect to which the amounts were distributed exceeded the amounts of the distributions. We have previously held that each of the Wherry corporations recovered the full basis of its assets prior to the close of the calendar year 1957 and this would dispose of this *145 argument of petitioners were it relevant. However, the relevant fact with respect to whether gain is realized on a distribution to stockholders in liquidation is not the basis of the assets of the distributing corporation but the basis of the stockholder to which the distribution is made in the stock of the distributing corporation. We have previously discussed the fact of the redemptions of the class A common stock of Ord and Monterey so that it is apparent Honolulu had a basis of zero in the class A common stock of each of those two corporations at the date of distribution of the funds withdrawn from the District Court in 1958. There is nothing in the record to show the bases of Honolulu in the class A common stock of Biggs and El Paso or any adequate proof of its basis in the class B stock of any of the corporations. In connection with the allocation between class A and class B stock of losses availed of by Monterey which would not have been available to it except for the filing of a consolidated return, we put a basis of $15,000 on the class B stock of Monterey from a balance sheet figure appearing in the record. We took this balance sheet figure because of the fact that respondent *146 had the burden of proof and had not shown that this amount did not represent Honolulu's basis in the stock. However, in the instant case respondent determined that the full $888,576.13 was taxable to Honolulu as a liquidating distribution and therefore the burden of showing that a lesser amount is taxable to Honolulu is on petitioners. Section 331 provides that amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock, and respondent has in his notice of deficiency so treated the distribution of $888,576.13 to Honolulu by treating the amount as a capital gain to Honolulu. Petitioners in their reply brief, make the statement that "Honolulu Corp. received the cash either as a liquidating dividend or as a collection on the chose-in-action which Honolulu Corp. was to receive as a result of the liquidation," and that if the amount were received as a liquidating dividend, it "is not the gross assets received, but the net amount determined by the liabilities to which the assets received may be subject." Petitioners argue that if the cash was received as a collection on a claim against the United States, Honolulu's basis in *147 the claim exceeded the cash receipts. The evidence fails to show that any chose-in-action against the United States had been distributed by the Wherry corporations to Honolulu prior to the cash distribution here involved. Therefore the only argument made by petitioners against respondent's treatment of the $888,576.13 as having been received as a liquidating dividend which we need to consider further is petitioners' contention that the cash received was subject to liabilities so that the net amount should be determined as having been received. A comparison of the liabilities shown on the balance sheet of the Wherry corporations as of June 30, 1958 and June 30, 1959, indicates that the distribution made in August 1958 was not subject to any liabilities. At that time the claims against the United States are not shown to have been distributed and it is not shown that such claims would not be of sufficient value to discharge any liabilities that the Wherry corporations had. If at some later date it were determined that some liability did exist which Honolulu was required to pay, the amount would be a capital loss to Honolulu in a later year. Arrowsmith v. Commissioner, 344 U.S. 6 (1952). *148 If petitioners had in mind some liability of Honolulu as a transferee for income taxes of the Wherry corporations, the amounts would not be proper reductions of the distributions but any adjustment would be made in Honolulu's income in the year that the liability for such taxes is determined or paid. James Armour, Inc., 43 T.C. 295, 312 (1964). We therefore sustain respondent in his determination that the entire $888,576.13 constituted a capital gain to Honolulu in its fiscal year ended June 30, 1959. Transferee Liability Issue 9 It is not clear that petitioners contest the determination of transferee liabilities against Honolulu, Foster, and his sons except insofar as they contest the liabilities determined against the transferor corporations. The facts we have set forth and our ultimate facts on this issue dispose of the extent of the liability of Honolulu, Foster, and each of Foster's three sons as transferees of the Wherry corporations. If there is an issue in respect to the transferee liability, we hold that the extent of the liability of each of the transferees is as set forth in our ultimate finding on this issue. Decisions will be entered under Rule 50. *149 Footnotes
1. Proceedings of the following petitioners are consolidated herewith: T. Jack Foster, Docket Nos. 1005-64, 1026-64, and 1028-64; T. Jack Foster, Jr., Docket Nos. 1029-64, 1035-64, 1404-64, and 1042-64; John R. Foster, Docket Nos. 1025-64, 1030-64, 1034-64, and 1039-64; Richard H. Foster, Docket Nos. 1027-64, 1036-64, 1037-64, and 1041-64; and Likins-Foster Honolulu Corp., Docket Nos. 1031-64, 1032-64, 1033-64, 1038-64, and 1088-64.↩
2. Likins-Foster Ord Corporation, Likins-Foster Monterey Corporation, Likins-Foster Biggs Corporation, and Likins-Foster El Paso Corporation each ceased to be a member of the consolidated group as of February 10, 1958, and were therefore not included in the consolidation for the remainder of the fiscal year ended June 30, 1958, or for any portion of the fiscal year ended June 30, 1959. The first year for which Central Development Company, Ltd., was a member of the consolidation was the fiscal year ended June 30, 1958, and it continued to be a member of the consolidation through the fiscal year ended June 30, 1959. All other subsidiaries were members of the consolidation throughout the entire period covered by the fiscal years here in issue.↩
3. All references are to the Internal Revenue Code of 1954 unless otherwise stated.↩
4. We will use the term "separate net operating loss carryover" to refer to carryover of affiliates from years for which separate returns were filed and the terms "separate income" or "separate net income" to refer to the income of affiliates computed prior to the combining of the income and losses of all members of the affiliated group for the computation of consolidated net income.↩
*. It is stipulated that 421 buildings were sold and the variance between the 411 buildings sold and the stipulated figure is unexplained in the record.↩
*. This loss carryover was as of the close of the separate fiscal year of Biggs Rental Co., ended August 31, 1956.↩
*. Indicates that the separate net operating loss available to the corporation was larger than its net income.↩
*. Respondent has adjusted the reported loss to ($78,664).↩
*. The calendar years ending December 31 are in the fiscal years of the corporation ending June 30 of the following year.↩
*. Day of month illegible on exhibit.↩
5. Fee simple estates are usually not obtainable in Hawaii due to the concentration of land holdings in large estates. The typical form of acquiring property for private use is by long-term lease.↩
*. It is stipulated that Honolulu entered on its books the amount of $888,576.13 to represent its 79 1/3 percent share of the amounts withdrawn from court. However, the sum of 79 1/3 percent of each of the four amounts withdrawn is $888,575.39 (79 1/3 percent of the total amount withdrawn ($1,120,053) is $888,575.38).↩
*. This figure represents three amounts: ↩
Additional just compensation awarded by jury
$323,947.00
Agreed amount due for personal property
49,534.58
Mortgage insurance refund
38,647.36
$412,128.94
6. SEC. 482. ALLOCATION OF INCOME AND DEDUCTIONS AMONG TAXPAYERS. In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses. Sec. 1.482-1(b)(2), Income Tax Regs.
* * * If a controlled taxpayer makes a separate return, the determination is of its true separate taxable income. If a controlled taxpayer is a party to a consolidated return, the true consolidated taxable income of the affiliated group and the true separate taxable income of the controlled taxpayer are determined consistently with the principles of a consolidated return.↩
7. Net income
Collections
Loss carry-
for fiscal
on sales -
over
year 1957
1957
Ord
$ 81,875
$ 85,753
$ 95,314
Monterey
123,139
86,093
142,455
Biggs
106,418
106,344
110,098
El Paso
114,945
114,580
124,974 Without the benefit of the income from the sales of the Topeka houses they would have had no net taxable income.↩
8. Sec. 1.1502-31(b)(3)↩ [Income Tax Regs.] Limitation on net operating loss carryovers and carrybacks from separate return years. In no case shall there be included in the consolidated net operating loss deduction for the taxable year as consolidated net operating loss carryovers or carrybacks under paragraphs * * * (relating to net operating losses sustained by a corporation in years for which separate returns were filed, or for which such corporation joined in a consolidated return filed by another affiliated group), an amount exceeding in the aggregate the taxable income of such corporation included in the computation of the consolidated taxable income for the taxable year decreased by its deductions under sections 181, 243, 244, 245, 247 and 922 (and in the case of a member of an affiliated group to which the consolidated section 175 deduction is applicable, the section 175 deduction), increased by its separate net capital gain, and increased or decreased, as the case may be, with respect to its separate gains and losses from involuntary conversions subject to the provisions of section 1231, and from sales or exchanges of property subject to the provisions of section 1231 * * * 9. SEC. 1501. [I.R.C. 1954] PRIVILEGE TO FILE CONSOLIDATED RETURNS. An affiliated group of corporations shall, subject to the provisions of this chapter, have the privilege of making a consolidated return * * *. The making of a consolidated return shall be upon the condition that all corporations which at any time during the taxable year have been members of the affiliated group consent to all the consolidated return regulations prescribed under section 1502 prior to the last day prescribed by law for the filing of such return. The making of a consolidated return shall be considered as such consent. * * *↩
10. Substantial changes have been made or proposed in consolidated regulations for years after 1965, but, of course, here we are not concerned with these changes.↩
11. Under our holding with respect to other issues, the amount of the consolidated net income prior to the use of any net operating loss carryovers will probably be changed from the income as reported by petitioners but we will use the reported income as illustrative of this issue.↩
12. Sec. 1.1502-31(b)(2)(ii), Income Tax Regs.
(ii) Dividends received. In the computation of the dividends received, there shall be excluded all dividends received from other members of the affiliated group.↩
13. SEC. 316, I.R.C. 1954. DIVIDEND DEFINED. (a) General Rule. - For purposes of this subtitle, the term "dividend" means any distribution of property made by a corporation to its shareholders - (1) out of its earnings and profits accumulated after February 28, 1913, or (2) out of its earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made. Except as otherwise provided in this subtitle, every distribution is made out of earnings and profits to the extent thereof, and from the most recently accumulated earnings and profits. To the extent that any distribution is, under any provision of this subchapter, treated as a distribution of property to which section 301 applies, such distribution shall be treated as a distribution of property for purposes of this subsection.↩
14. SEC. 301(c) Amount Taxable. - In the case of a distribution to which subsection (a) applies - (1) Amount constituting dividend. - That portion of the distribution which is a dividend (as defined in section 316) shall be included in gross income. (2) Amount applied against basis. - That portion of the distribution which is not a dividend shall be applied against and reduce the adjusted basis of the stock. (3) Amount in excess of basis. - (A) In general. - Except as provided in subparagraph (B), that portion of the distribution which is not a dividend, to the extent that it exceeds the adjusted basis of the stock, shall be treated as gain from the sale or exchange of property. (B) Distributions out of increase in value accrued before March 1, 1913. - That portion of the distribution which is not a dividend, to the extent that it exceeds the adjusted basis of the stock and to the extent that it is out of increase in value accrued before March 1, 1913, shall be exempt from tax.↩
15. SEC. 1.1502-31(b) Computations. In the case of affiliated corporations which make, or are required to make, a consolidated return, and except as otherwise provided in the regulations under section 1502: (1) Taxable income. The taxable income of each corporation shall be computed in accordance with the provisions covering the determination of taxable income of separate corporations, except: * * *
(2) Other computations on separate basis. The various other computations required by the regulations under section 1502 to be made by the several affiliated corporations shall be made in the case of each such corporation in the same manner and under the same conditions as if a separate return were to be filed, but with the following exceptions: * * *
(iii) Capital gains and losses. Capital gains and losses, short-term capital gains and losses, long-term capital gains and losses, and the additional capital loss deduction authorized by section 832(c)(5) shall be determined without regard to: (a) Gains or losses arising in intercompany transactions (other than gains described in section 357(c) and gains recognized to the distributing corporation pursuant to section 311(c) by reason of distributions by one member of the group to another member of the group, * * *↩
16. Sec. 1.1502-37 Liquidations; recognition of gain or loss. (a) During consolidated return period. (1) Gain or loss shall not be recognized upon a distribution during a consolidated return period, by a member of an affiliated group to another member of such group, in cancellation or redemption of all or any portion of its stock, except - (i) Where such distribution is in complete liquidation and redemption of all of its stock (whether in one distribution or a series) and of its bonds and other indebtedness, if any, and falls without the provisions of section 332, and is the result of a bona fide termination of the business and operations of such member of the group, in which case the adjustments specified in §§ 1.1502-34 and 1.1502-35 shall be made, and § 1.1502-36 shall be applicable; (ii) Where such a distribution without the provisions of section 332 is one made in cash in an amount in excess of the adjusted basis of the stock, and bonds and other indebtedness, in which case gain shall be recognized to the extent of such excess; or * * *↩
17. Sec. 1.1502-33 Gain or loss from sale of stock, or bonds or other obligations. Gain or loss from the sale or other disposition (whether or not during a consolidated return period), by a corporation which during any period of time has been a member of an affiliated group which makes or is required to make a consolidated return, of any share of stock or any bond or other obligation issued or incurred by another corporation which during any part of such period was a member of the same group, shall be determined, and the extent to which such gain or loss shall be recognized and shall be taken into account shall also be determined, in the same manner, to the same extent, and upon the same conditions as though such corporations had never been affiliated except - (a) In the case of a disposition (by sale, or in complete or partial liquidation not involving cash in an amount in excess of the adjusted basis of both the stock and the bonds and other indebtedness liquidated, or otherwise) during a consolidated return period to another member of the group ( §§ 1.1502-31 and 1.1502-37); * * *↩
18. Respondent's computation is as follows: Adjustment
Reduction of
under Sec.
Extent
adjust-
1.1502-34
separate-
ly available
ment due
(b)(2)
to
Fiscal year
Monterey as
to consol-
Income
ended
Taxable income
net loss de-
idated
Tax
June 30
Monterey
Consolidated
duction
loss
Regs.
1954
($
($224,615.30
0
$23,729.03 *
($ 148.36)
23,877.39)
)
1955
(
(
0
55,572.06 *
( 23,091.93)
78,663.99)
248,820.96)
1956
(
449,799.81
0
0
( 72,090.25)
72,090.25)
($174,631.6
$79,301.09
($95,330.54)
3)
a1 Monterey's loss / Total losses of all corporations having losses X Consolidated loss↩
19. 42 U.S.C. 1594a(c)(2) provides in part as follows: In any condemnation proceedings instituted to acquire any such housing, or interest therein, the court shall not order the party in possession to surrender possession in advance of final judgment unless a declaration of taking has been filed, and a deposit of the amount estimated to be just compensation has been made, under section 258a↩ of Title 40. The amount of such deposit for the purpose of this section shall not in any case be less than an amount equal to the actual cost of the housing (not including the value of any improvements installed or constructed with appropriated funds) as certified by the sponsor or owner of the project to the Federal Housing Commissioner pursuant to any statute or any regulation issued by the Federal Housing Commissioner, reduced by the amount of the principal obligation of the mortgage outstanding at the time possession is surrendered, but any such deposit shall not include any excess mortgage proceeds or "windfalls", kickbacks and rebates received in connection with the construction of said housing as determined by the Department of Defense, or any other Federal agency. * * *
20. This identical question was passed upon by this Court in Moses Lake Homes, Inc., T.C. Memo. 1964-289. There we held that, "It is nevertheless clear that as a result of the involuntary disposition of their leasehold interest, the petitioners on March 1, 1958, realized the amount of the total mortgages outstanding, subject to which their leasehold estates on that date were transferred to the United States Air Force. Crane v. Commissioner, 331 U.S. 1; Parker v. Delaney, 186 F. 2d 455: Wala Garage v. United States, 163 F. Supp. 379↩."
21. SEC. 337. GAIN OR LOSS ON SALES OR EXCHANGES IN CONNECTION WITH CERTAIN LIQUIDATIONS. (a) General Rule. - If - (1) a corporation adopts a plan of complete liquidation on or after June 22, 1954, and (2) within the 12-month period beginning on the date of the adoption of such plan, all of the assets of the corporation are distributed in complete liquidation, less assets retained to meet claims, then no gain or loss shall be recognized to such corporation from the sale or exchange by it of property within such 12-month period.↩
22. This same section of the United States Code was involved in Covered Wagon, Inc., T.C. Memo. 1965-79↩, in which we held that the "sale" occurred on the date of the filing of the declaration of taking for the purposes of sec. 337(a).